**ST. PAUL FIRE AND MARINE INSUR-ANCE COMPANY, a corporation, Plaintiff-Appellant,**

v.

**MICHIGAN NATIONAL BANK OF DE-TROIT, a national banking corporation, Defendant-Appellee.**

No. 79–1533.

United States Court of Appeals, Sixth Circuit.

Argued Feb. 19, 1981.

Decided Sept. 23, 1981.

Rehearing and Rehearing En Banc Denied Nov. 10, 1981.

Ronald A. Deneweth, Jenkins, Nystrom & Sterlacci, Janis B. DeGennaro, Southfield, Mich., for plaintiff-appellant.

Victor T. Adamo, Nederlander, Dodge & McCauley, Detroit, Mich., for defendant-appellee.

Before MERRITT, BROWN and KENNEDY, Circuit Judges.

BAILEY BROWN, Circuit Judge.

This is a diversity case to which Michigan law applies. The issue presented is whether a surety on a payment bond of a contractor, after paying a claim of a subcontractor, may maintain an action against a bank, which untimely dishonored for insufficient funds a check issued by the principal to the subcontractor, as assignee of the subcontractor's claim against the bank for such untimely dishonor of the check. The district court, Honorable Charles W. Joiner, held, on motion for summary judgment, that the surety could not maintain such an action and granted summary judgment to the bank. We agree and therefore affirm.

Appellant, St. Paul Fire and Marine Insurance Company (St. Paul), agreed to act as surety for Leo and Cappello/V. Pangori, Inc. (L & C), a general contractor, with respect to a construction project. In connection with this project, L & C became indebted to a subcontractor, Precision Pipe and Supply Company (Precision), which had supplied the project with labor and materials. In satisfaction of this debt, Precision received a check for $35,575.45, drawn by L & C on its bank, Michigan National Bank of Detroit (Michigan Bank), appellee herein.

Precision deposited this check in its account at the Wayne Oakland Bank on July 2, 1976, which, in turn, transferred the check to the Detroit Bank and Trust Company, its correspondent bank in the Detroit Clearing House Association. On July 6, 1976, the check was transferred to Michigan Bank, which allegedly gave oral notice of dishonor due to insufficient funds on July 7, 1976 and admittedly gave written notice of dishonor on July 8, 1976. St. Paul contends that written notice was required and was untimely under the applicable Uniform Commercial Code provisions and Clearing House Association rules and that, under Michigan law, the untimely dishonor subjected Michigan Bank to liability to the payee, Precision, for the face amount of the check. For the purposes of this appeal, this court, as did the district court, accepts these contentions as correct, that is, that Michigan Bank would have been liable to Precision.[1]

Upon the dishonor of L & C's check, Precision initially proceeded against L & C and St. Paul, ultimately obtaining a default judgment for the face amount of the check, $35,575.45. Subsequently, however, the parties agreed by stipulation to set aside the default judgment. St. Paul then paid Precision $35,575.45 in return for an assignment of Precision's cause of action against Michigan Bank. St. Paul then instituted this action, as Precision's assignee, against Michigan Bank for untimely dishonor.

As stated, the district court granted summary judgment to Michigan Bank; it held that after the underlying obligation had been satisfied by St. Paul, no cause of action against Michigan Bank remained in existence that could be assigned. For the reasons expressed below, we affirm.

Initially we note that in the trial court and on appeal St. Paul expressly eschews any rights it may have by virtue of subrogation; St. Paul relies solely on its status as assignee of Precision's claim against Michigan Bank.[2] Accordingly, we begin our analysis with the well-settled proposition that "an assignee of a cause of action acquires the same right, title and interest enjoyed by the assignor." *State Mutual Life Assurance Co. v. Deer Creek Park*, 612 F.2d 259, 268 n.7 (6th Cir. 1979) (Michigan diversity case); *see also* 6 Am. Jur.2d, Assignments § 119 (Supp.1981). Thus, a determination of the right, title and interest held by Precision at the time of the assignment will necessarily resolve the question of what right, title and interest is currently held by St. Paul with respect to the present action.

At the outset it is clear that, in return for the assignment, Precision received total satisfaction for its injury. The $35,575.45 paid by St. Paul is the amount Precision was entitled to had it brought suit against St. Paul or Michigan Bank. More importantly, however, St. Paul also obtained a complete release from Precision. Although no written release appears in the record, the following colloquy between St. Paul's counsel, Mr. Deneweth, and the district court, which occurred during the hearing on Michigan Bank's motion for summary judgment, indicates that a release was obtained.

**1.** Michigan Bank contends that it incurred no liability to Precision because: the notice given was sufficient and timely; it owed no duty to Precision with respect to notice; and, this action is barred by laches.

**2.** We gather that the reason that St. Paul chose not to proceed on a subrogation theory was because it doubted that it could have prevailed under such theory. A party who claims and attempts to enforce subrogation rights must be able to show superior equities before he can recover. The only fault that Michigan Bank is guilty of, under St. Paul's theory of the case, is delaying notification of dishonor by one day. (Although there was a contention made by St.

Paul for the first time in its untimely motion to rehear before the district court that Michigan Bank made some unauthorized charges against the account of L & C, the trial court correctly refused to consider this assertion because it was untimely and because no support for the contention was presented.) St. Paul, on the other hand, for good consideration, expressly assumed the risk that L & C would not pay its debts to its subcontractors. Moreover, had Michigan Bank paid the check in spite of insufficient funds, it would arguably have had, by subrogation, a claim against St. Paul. In any event, as we have said, no right of equitable subrogation is urged here.

THE COURT: Did you pay more than was necessary?

MR. DENEWETH: We only paid the principal amount of the check. That's what was bargained for, 35,000-some-odd-dollars versus giving us an assignment and releases us from all liability on Leo & Cappello.

THE COURT: You didn't have an obligation? You paid the check?

MR. DENEWETH: We paid the check, so the basis of our lawsuit—

THE COURT: You still owe the original obligation; is that what you're saying?

MR. DENEWETH: No, Your Honor. We got a complete release from Precision for honoring the check. We bargained for the release.

That a release was obtained is also indicated by St. Paul's statement that "Precision Pipe was fortunate enough to avail itself of the immediate remedy against [St. Paul]." Appellant's Brief at 8. Indeed, if St. Paul brought an assignment only, and did not obtain a release, Precision could have, after making the assignment, maintained suit against St. Paul on its bond.

Precision had available two alternative but consistent avenues of redress after the L & C draft was dishonored, one against L & C and St. Paul on the debt and the other against Michigan Bank for untimely dishonoring the check. Thus, the issue distilled is whether, having released St. Paul in consideration for full satisfaction of its debt, Precision could maintain an action against Michigan Bank. Clearly it could not.

To allow Precision, after settling in full with St. Paul, to bring an action against Michigan Bank, would, as the district court found, result in Precision's obtaining an impermissible double recovery. Several doctrines have evolved to prevent this result. The doctrine most analogous to the instant case is the release doctrine as applied to independent concurrently negligent tortfeasors. In such a case, as here, the injured party has available two alternative means of recovery for the same injury.

Admittedly a distinction lies in that the wrongdoers' liability in such a case springs from the commission of separate torts, but it is a distinction without a difference, as the essential features in both instances are the same: there are two separate bases of liability, and the entire loss can be recovered from either party. The general rule in Michigan is that "the release doctrine does not apply to independent concurrently negligent tortfeasors." *Witucke v. Presque Isle Bank*, 68 Mich.App. 599, 243 N.W.2d 907, 911 (1976). The Michigan courts do, however, recognize an exception to the general rule that is important here. In *Witucke*, the court noted:

> [A] release to one of two tortfeasors who had acted in concert necessarily released the other, since there was in the eyes of the law but one cause of action against the two, liable for the same acts, which was surrendered. But as to independent wrongdoers, not acting in concert, who were liable for the same loss, there seems to be no reason to conclude that a release of one would release the others, *except in so far as it was based upon actual satisfaction of the claim.*

*Id.* at 910, *quoting from* Prosser on Torts, § 49, p. 301 (4th Ed. 1971) (emphasis added). Quoting from page 302 of the same learned work, the court continued:

> [C]auses of action against mere concurrent tortfeasors not acting in concert have always been separate, and their separate character should not be affected by the possibility of joinder for procedural convenience. A surrender of one therefore should not on any logical or reasonable basis discharge the other, *except to the extent that there has been full compensation.*

*Id.* (emphasis added). Similarly, the rule has been stated to be that "[a] releasor can have but one satisfaction for his injury, and the receipt of full satisfaction as the consideration for a release necessarily works a discharge of all others liable for the same injury." 66 Am.Jur.2d, Release § 40 (Supp. 1981) (citations omitted). *See also Sobotta*

*v. Vogel*, 37 Mich.App. 59, 194 N.W.2d 564, 566 (1971) (if release constitutes complete satisfaction, plaintiff not entitled to further relief from another who may be independently liable). Thus, it is clear that, after releasing St. Paul and obtaining full satisfaction therefrom, Precision could not maintain a separate action against Michigan Bank, and neither can its assignee, St. Paul.[3]

The doctrine of election of remedies would also preclude Precision, or its assignee, from maintaining an action against Michigan Bank. In *Rutter v. King*, 57 Mich.App. 152, 226 N.W.2d 79 (1974), the court stated the applicable rule when a party has alternative but consistent remedies available.

> Where plaintiff has alternate remedies, which are not inconsistent, the mere commencing of an action in a separate forum or resorting to one remedy is not a bar to commencing a different form of action. In such case there is no election until one of them is pursued to judgment.

*Id.* at 82. Even if the default judgment that was, by agreement between the parties, set aside may not be relied upon for invocation of this doctrine, we are of the opinion that Michigan courts would view full satisfaction of the claim, after the judgment in the same amount had been set aside, as the practical equivalent of a judgment. We are aware of no circumstance that would induce Michigan courts to depart from the rule that active pursuit of one of two consistent remedies is a bar if, as is the case here, full satisfaction is obtained. *See generally*, 25 Am.Jur.2d, Election of Remedies § 12 (Supp.1981).

We note that in *American Surety Co. v. Bank of California*, 133 F.2d 160 (9th Cir. 1943), the court, applying Oregon law, reached a result consistent with the holding in the instant case on somewhat similar facts. In *American Surety* the injured company (Interior), which was a depositor in defendant bank, suffered losses when its employee cashed checks on the company's account over forged endorsements. Interior was protected by surety bonds against such a loss, and the sureties (Insurers) reimbursed Interior and took an assignment of its claim against the bank. The *American Surety* court initially held that the surety could not recover on the basis of equitable subrogation because the equities in that case did not preponderate in favor of the sureties. *Id.* at 164. Turning to the issue of the effect of the assignment, the court held:

> If Insurers have no right to subrogation, their position is not improved by the assignments to them of insured's claim against Bank. When Insurers paid Interior, the right of Interior to pursue its claim against Bank was destroyed as Interior would not be permitted a dual recovery. Therefore, there was in existence no enforceable claim against Bank which Interior could assign to Insurers, and which would support recovery in favor of Insurers.

*Id.* The *American Surety* court recognized, as do we, that allowing an assignee to maintain a cause of action against one independently liable when the injured party has already received full compensation from another who is also liable would, in effect, give the injured party double recovery.

This court totally rejects St. Paul's assertion that our holding "destroy[s] a creditor's right to assign a claim when that creditor has available to it two alternative but consistent means of collection." Appellant's Brief at 7. Our holding in no way limits the assignability of a chose in action. St. Paul stands in the same position as an assignee who takes an assignment with knowledge that, in consideration for a release, the assignor has obtained full satis-

---

**3.** It should be noted that had St. Paul asserted a right of subrogation and had it been able to demonstrate a superior equitable position to that of Michigan Bank, the release by Precision would have been no impediment to St. Paul. This is so because the very theory of subrogation is to keep the claim alive for the benefit of the party that is subrogated to the claim.

faction from one of the alternative sources of recovery. Finally, this court emphasizes that our holding does not decide what, if any, rights St. Paul had available to it in any capacity besides that of Precision's assignee.[4]

For the reasons expressed above the judgment of the district court is AFFIRMED.

MERRITT, Circuit Judge, dissenting.

The Court holds that the surety's payment to the creditor (Precision) of his principal's indebtedness on the negotiable instrument extinguishes the underlying debt and restricts the surety to an action for subrogation. Thus, since the surety has paid the debt evidenced by the instrument, the assignment of the creditor's cause of action against the bank for untimely dishonor of the instrument is a nullity. I disagree with this line of reasoning.

There is a clear split of authority on the question whether a surety who pays his principal's note or draft is restricted to a suit for subrogation or reimbursement on the theory that the surety's payment discharges the debt. Some courts keep the negotiable instrument alive and permit assignment, and others say it is discharged and dead. See Annots., 36 A.L.R. 553, 575–83 (1925), 77 A.L.R. 668, 672–74 (1932). It appears that Michigan is a jurisdiction that keeps the underlying instrument and indebtedness alive and permits assignment to the surety of the instrument and choses in action arising from its negotiation. See *Schram v. Spivack*, 68 F.Supp. 451 (E.D. Mich.1946). It seems to me that in light of these cases the fairest decision here is to permit the assignment and to reverse and remand the case to the District Court for a determination of the question whether the bank's untimely dishonor of the instrument caused the creditor's and hence the surety's loss. The court's formalistic reasoning that the underlying debt is discharged and the assignment a nullity has the effect of throwing the plaintiff out of court because he sought the wrong writ. If he had filed a bill for subrogation or a writ of indebitatus assumpsit, his action would lie but not an action for debt. The case should not be made to turn on this kind of technicality. Moreover, permitting an assignment by the creditor to the surety provides an added incentive for the surety to pay off.

---

4. The two annotations cited in the dissent, 36 A.L.R. 553 (1925) and 77 A.L.R. 668 (1932), are styled "Rights and Remedies of Accommodation Party to Paper as Against Accommodated Party After Judgment" and deal with that question. The case cited in the dissent, *Schram v. Spivack et al.*, 68 F.Supp. 451 (E.D.Mich.1946), holds that where an accommodation party and an accommodated party on a note suffer a judgment and the accommodation party pays the judgment and takes an assignment of the judgment from the judgment creditor, the accommodation party may recover from the accommodated party. However, it must be that the accommodation party does not recover on the judgment *qua* judgment for if this were true the accommodated party, upon paying the judgment to the judgment creditor and taking an assignment from him, could recover on the judgment against the accommodation party. Thus it must be that the accommodation party, after paying the judgment and taking an assignment, can recover against the accommodated party because, as between the two, the accommodated party owed the debt and therefore it can be said that there is an implied promise to reimburse the accommodation party or that equity is on the side of the accommodation party. (See annotations.)

The dissent would remand to the district court to determine whether superior equity is on the side of St. Paul. But St. Paul did not pursue this theory below or here; its basic position has been that, whether or not superior equity is on its side, it has an assignment from Precision and for this reason alone it is entitled to recover against Michigan Bank.