In re NATIONAL MORTGAGE EQUITY CORPORATION MORTGAGE POOL CERTIFICATES SECURITIES LITIGATION.

No. MDL 647 AWT.

United States District Court,
C.D. California.

May 13, 1986.

Memorandum Opinion II And Order
May 29, 1986.

Alan D. Bersin, Jeffrey I. Weinberger, Anne H. Egerton, Michael E. Soloff, Susan E. Nash, Munger, Tolles & Olsen, Los Angeles, Cal., for Bank of America NT & SA.

Arthur J. Shartsis, Mary Jo Shartsis, Charles R. Rice, Tracy L. Salisbury, Shartsis, Friese & Ginsburg, San Francisco, Cal., for Riverhead Sav. Bank, First Federal Sav. & Loan Ass'n, Missouri Sav. Assn.

Joseph C. Lepanto, Mesirov, Gelman, Jaffe, Cramer & Jamieson, Philadelphia, Pa., for First Federal Sav. & Loan Assn.

Gideon H. Schiller, Portman, Bernhardt, Kessler & Black, St. Louis, Mo., for Missouri Sav. Assn.

Harvey Besunder, Cruser, Hills, Hills & Besunder, Riverhead, N.Y., for Riverhead Sav. Bank, F.S.B.

Charles C. Wehner, Rodney M. Perlman, Robert F. Hinton, Karen A. Rooney, Wehner & Perlman, Los Angeles, Cal., for Nat. Mort. Equity Corp., David Feldman.

John A. Donovan, James E. Lyons, Floran L. Fink, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., for Lord, Bissell & Brook, Leslie W. Michael.

George H. Link, Gregg A. Farley, Brobeck, Phleger & Harrison, Los Angeles, Cal., William E. Trautman, Robert P. Varian, Brobeck, Phleger & Harrison, San Francisco, Cal., for Wells Fargo Bank, William Van Zile.

Alexander L. Brainerd, Richard A. Ardoin, Bronson, Bronson & McKinnon, San Francisco, Cal., for Mebac.

Charles Jarvis Murray, San Francisco, Cal., for West-Pac Corp., Kent B. Rogers.

Kurt W. Melchior, Mark Joseph Kenney, Severson, Werson, Berke & Melchior, San Francisco, Cal., for Lomas and Nettleton Co.

Martin H. Kresse, Robert J. Yorio, Barbara Cray, McKenna, Conner & Cuneo, San Francisco, Cal., for Umpqua Sav. & Loan Assn.

Randall L. Hite, Santa Ana, Cal., for Energy Resources, Inc., Marvin H. Weiss.

Floyd Anglin, Santa Ana, Cal., pro. per.

Styn & Garland, San Diego, Cal., for American Title Ins.

William V. McTaggart, Jr., Parker, Milliken, Clark, O'Hara & Samuelian, Los Angeles, Cal., for Glacier General Assur. Co.

Randall H. Gray, James Gray & McCafferty, Great Falls, Mont., for Andrea Bennett, Liquidator of Glacier General Assur. Co.

## MEMORANDUM OPINION AND ORDER

TASHIMA, District Judge.

## I. PROCEDURAL BACKGROUND

This multidistrict litigation involves allegations of massive fraud in connection with the sale of mortgage pool certificates to numerous savings banks and savings and loan associations ("Investor Institutions"). Before the Court are several defendants' motions to dismiss the complaints in four of these actions, as well as two plaintiffs' motions to dismiss certain counterclaims.[1]

The complaints under attack are those of Riverhead Savings Bank ("Riverhead"), Missouri Savings Association ("Missouri"), First Federal Savings and Loan Association ("First Federal"), and Bank of America ("B of A" or the "Bank").[2] B of A's complaint differs significantly from the other three.

---

1. The motion for summary adjudication of defendants Wells Fargo Bank and William Van Zile ("Van Zile"), which had been noticed for hearing at the same time as the motions to dismiss, was ordered off calendar by the Court.

2. The actions of the first three plaintiffs were transferred here from the Northern District of

California by the Judicial Panel on Multidistrict Litigation and bear individual docket numbers CV 85-5493 AWT, CV 85-5494 AWT and CV 85-5495 AWT, respectively, in this Court. B of A's action, No. CV 85-1415 AWT, was originally commenced in this Court.

It not only asserts claims which the Bank brings in its own right, but also claims which B of A purports to bring as the assignee of nineteen Investor Institutions that are alleged to be victims of the fraud.[3]

This opinion addresses only the motions to dismiss directed at B of A's complaint. The motions to dismiss the other three complaints, as well as the motions to dismiss certain counterclaims, will be addressed in a separate memorandum opinion to be filed shortly.

## II. THE ALLEGED FACTS [4]

### A. FORMATION AND MARKETING OF THE POOLS

Defendant David A. Feldman ("Feldman"), promoted, organized and managed defendant National Mortgage Equity Corporation ("NMEC").[5] Beginning in 1981, NMEC organized pools of real estate loans secured by first or second deeds of trust on residential real property, located primarily in California and Texas. Riverhead, Missouri and First Federal allege that defendants Wells Fargo Bank ("Wells Fargo") and Advance Mortgage Corporation ("Advance")[6] also played a role in promoting the formation of certain of the pools during 1981 and 1982. In connection with these mortgage pools, NMEC marketed "Mortgage Pass-Through Certificates" (the "Certificates") to various financial institutions, i.e., the Investor Institutions. Each Certificate represented an undivided interest in an individual pool. The Certificate holder was entitled to receive interest at a fixed "pass-through" rate, regardless of the rates paid by individual mortgagors. NMEC solicited buyers of Certificates, i.e., Investor Institutions, through various means, including, as alleged by B of A, through Private Placement Memoranda ("PPM"). The PPM were prepared by defendant law firm Lord, Bissell and Brook ("Lord Bissell"). Defendant Leslie W. Michael ("Michael"), is a partner in Lord Bissell and was also a part owner and officer of NMEC.

NMEC was responsible for the initial selection of loans to be included in the pools. B of A was to act as escrow agent for each pool. Advance was to act as servicer on the mortgages for at least some of the pools, and did so act until March, 1983, when it resigned and was replaced by NMEC. NMEC apparently at all times acted as servicer for all the loans in the pools that form the basis of B of A's complaint. A trustee was appointed for each pool. B of A was trustee for most of the pools, but with respect to four pools, Wells Fargo acted as trustee.[7] In their respective roles as trustees, Wells Fargo and B of A were to review the documentation NMEC provided regarding each mortgage in order to determine whether it complied with all the applicable standards set out in the pooling and service agreements.

3. The Investor Institutions that assigned their claims to Bank of America are: The Seamen's Bank for Savings, Liberty Federal Savings and Loan Association, Whitestone Savings and Loan, First Federal Savings of Philadelphia, Irving Savings and Loan Association, Columbia Federal Savings Bank, Provident Savings and Loan, Oneonta Federal Savings and Loan Association, United Federal Savings Bank of Iowa, Beacon Federal Savings and Loan Association, Bay Ridge Federal Savings, Riverhead Savings and Loan, Missouri Savings Association, City Federal Savings and Loan Association, Citizens Federal Savings and Loan Association of Cleveland, Anchor Savings Bank FSB, South Weymouth Savings Bank, Richmond Hill Savings Bank and Fidelity Savings Association.

4. Each of the four complaints which is the subject of a motion to dismiss alleges substantially the same facts as the others. Any material differences between the allegations in these complaints will be noted in the course of this recitation.

5. NMEC and Feldman are named as defendants in all four complaints, as are Lord, Bissell and Brook, and Leslie W. Michael.

6. Advance is the successor in interest to Advance Mortgage Company, Ltd. Neither Advance nor Wells Fargo is named as a defendant in B of A's complaint.

7. Among the pools for which Wells Fargo acted as trustee are the pools that form the basis of Riverhead's, Missouri's and First Federal's complaints.

NMEC, Feldman, Lord Bissell and Michael made numerous representations to the Investor Institutions regarding the nature of the mortgages selected for the pools.[8] Defendants represented that the underlying loans were made in arms-length transactions, the borrowers were capable of servicing their debts on the loans, the values of the residential properties involved were determined by independent appraisals, each loan was fully protected by mortgage insurance and that Glacier General Assurance Company ("Glacier") and Pacific American Insurance Company ("Pacific American"), the primary insurers, had the financial resources to cover any likely defaults and had also secured reinsurance.

## B. THE FRAUD

The essence of the fraud allegations is that despite defendants' representations respecting the high standards used to select mortgages for the pools, defendants actually were engaged in a widespread series of sham mortgage transactions between various related entities that diverted the Investor Institutions' funds for defendants' personal benefit. Entities and individuals related to or controlled by NMEC, including Michael, Glacier, Energy Resources Financial Inc. ("Energy Resources"), Marvin Weiss ("Weiss"), West Pac Corporation ("West Pac"), and Kent B. Rogers ("Rogers")[9] would obtain funds from NMEC. These entities or individuals would then use these funds to purchase properties through still other related entities. After obtaining a fraudulently inflated appraisal of the property, the related entities would arrange a "loan" between themselves, secured by a note and deed of trust on the overvalued property. The "loan" would then be transferred to NMEC's mortgage pools in exchange for cash the Investor Institutions had entrusted to NMEC.

B of A alleges that Glacier and Pacific American were an integral part of this scheme. It is alleged that these insurance companies were selected to insure the mortgages not because of their ability to provide adequate coverage but because they were related, through common principals, to one or more of the other participants in the scheme. It also is alleged that the insurance companies actively participated in the scheme by recycling properties on which borrowers had defaulted back into the NMEC pools.

This scheme began to unravel in late 1984 and early 1985. In October, 1984, the Seaman's Bank for Savings, one of the Investor Institutions for which B of A acted as trustee, advised the Bank of "certain irregularities in the processing and documentation" of the mortgages comprising Seaman's pool. B of A responded by conducting an investigation into NMEC pools. Through this investigation, the Bank learned not only of the NMEC-managed fraud, but also that its own employees had not, in the Bank's words, "adequately discharged the Bank's responsibilities" as escrow agent and trustee. As a result of its investigation, B of A filed an action in California state court against several of its own employees for their roles in the handling of the NMEC pools.

B of A's investigation also led it to conclude that as a result of the fraud, the Investor Institutions for which it had acted as trustee stood to lose all or most of their investments in the NMEC pools. The Bank, therefore, decided to "resolve its liability" to those Investor Institutions by repurchasing their Certificates or by replacing the mortgages in the pools represented by the Certificates. The Bank paid in cash and replacement collateral to the Investor Institutions a total of $133 million (which apparently was 100 percent of the funds

---

**8.** Riverhead's, Missouri's and First Federal's complaints also allege representations and omissions on the part of Wells Fargo, Advance, and Van Zile (an officer of Wells Fargo).

**9.** West Pac and Rogers are named as defendants in B of A's complaint. The Bank alleges that

West Pac was the mortgagor on a large number of the loans NMEC selected for the mortgage pools. Energy Resources and Weiss are named as third-party and crossclaim defendants by Wells Fargo and Van Zile.

invested in Certificates by them). It expects to realize $38 million on liquidation of the collateral and from the mortgage guarantee insurance claims assigned to it, leaving a net loss of $95 million from its resolving its liability to the Investor Institutions. In return, the Investor Institutions assigned to B of A any claims they might have against any of the defendants.[10] B of A then filed this action, both for damages sustained in its own right and as assignee of the Investor Institutions' claims.

Unlike B of A, Wells Fargo chose not to pay off its beneficiaries. Therefore, Wells Fargo, which had performed essentially the same trustee functions as B of A with respect to Riverhead's, Missouri's and First Federal's mortgage pools, was named by its beneficiaries as a defendant in this litigation.

B of A charges defendants NMEC, Feldman, Lord Bissell, Michael, West Pac, and Rogers with violations of: § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5; § 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q(a); the Racketeer Influenced and Corrupt Organization Act, Title IX of the Organized Crime Control Act of 1969 ("RICO"), 18 U.S.C. §§ 1961 *et seq.*; Cal. Corp.Code §§ 25401, 25501 & 25504.1; and common law fraud. There is also a claim against NMEC, Feldman, Lord Bissell and

Michael under § 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*(2), and a claim for breach of contract against NMEC alone. The Bank brings all of the above claims as assignee with the exception of the RICO claim, which is brought both as assignee and in the Bank's own right and one count of common law fraud, which is brought in the Bank's own right.

## III. DISCUSSION

In their motion to dismiss B of A's complaint, Lord Bissell and Michael (hereinafter, collectively "Lord Bissell") assert that each of the claims the Bank brings against them[11] as assignee should be dismissed under the "one-satisfaction rule," which is set forth in the Restatement (Second) of Torts § 885(3) (1979)[12] The one-satisfaction rule recognizes the principle that an injured party may recover only once for a single injury; its corollary is that any payment made by any person in compensation for a harm diminishes proportionally the injured party's claim against any tortfeasors. Lord Bissell contends that B of A's payments to its Investor Institutions constitute full satisfaction of those Investor Institutions' claims and, thus, operate to discharge fully all other tortfeasors from any liability to those Investor Institutions. *See* Restatement § 900(1)(b) & comment *b*.[13] Lord Bissell

10. B of A's complaint alleges:
 Bank of America is the assignee of all claims that exist on behalf of the Investor Institutions, and each of them, against the Defendants, and each of them, by reason of certain written agreements entered into between the Bank and the Investor Institutions. Plaintiff has succeeded to the claims of the Investor Institutions by operation of law. Comp., ¶ 6. It is also alleged that in exchange for the Bank's repurchasing of the Certificates or replacing the mortgages represented by the Certificates, "the Investor Institutions assigned to the Bank all interest they had in any properties or mortgage insurance securing the NMEC-originated loans." Comp., ¶ 55.

11. Because Lord Bissell and Michael are not named as defendants in the breach of contract claim, their motion is not directed against that claim. Therefore, assignment of the contract

claim is unchallenged and the Court need not address that issue.

12. All further references to the Restatement (Second) of Torts will be cited as the "Restatement." Restatement § 885(3) provides:
 A payment by any person made in compensation of a claim for a harm for which others are liable as tortfeasors diminishes the claim against the tortfeasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment.

13. Section 900(1)(b) provides that a cause of action for a tort may be discharged by a "satisfaction." Comment *b*, in turn, states, "A satisfaction is the payment made by the tortfeasor or by one acting in behalf of him of an amount

argues further that B of A should not be permitted to avoid the effect of the one-satisfaction rule by purporting to obtain assignments of the Investor Institutions' claims. Instead, they contend, the Bank must pursue the traditional remedies available to joint tortfeasors, *i.e.*, actions for contribution and/or indemnity.

The Court agrees with Lord Bissell's contentions with respect to the applicability of the one-satisfaction rule here and the assignability of the federal and state securities claims and the common law fraud claim. Consequently, those counts must be dismissed; however, B of A will be granted leave to file an amended complaint for contribution and/or indemnity, if it so elects.[14] I further conclude that the RICO claims are assignable and that B of A should be permitted to pursue the Investor Institutions' RICO claims, as their assignee.

### A. ASSIGNABILITY OF FEDERAL SECURITIES CLAIMS AND STATE LAW CLAIMS

■ Before discussing the validity of the Investor Institutions' assignments, the Court first must consider whether the one-satisfaction rule applies to the types of claims the Investor Institutions have assigned to the Bank. The applicability of the single-satisfaction rule to federal statutory claims in general, and securities claims specifically, is not in doubt. *E.g., Zenith Radio Corp. v. Hazeltine Research, Inc.,* 401 U.S. 321, 348, 91 S.Ct. 795, 811, 28 L.Ed.2d 77 (1971) (antitrust); *Ratner v. Sioux Natural Gas Corp.,* 719 F.2d 801, 803–04 (5th Cir.1983) (applying Texas tort law in federal securities case); *MacKethan*

*v. Burrus, Cootes & Burrus,* 545 F.2d 1388, 1390–91 (4th Cir.1976), *cert. denied,* 434 U.S. 826, 98 S.Ct. 103, 54 L.Ed.2d 85 (1977) (securities); *Gould v. American-Hawaiian S.S. Co.,* 535 F.2d 761, 784 & n. 30 (3d Cir.1976) (securities); *Screen Gems—Columbia Music Inc. v. Metlis & Lebow Corp.,* 453 F.2d 552, 554 (2d Cir.1972) (copyright infringement).

It likewise is settled that the rule applies to the claims the Bank brings under California law. California expressly recognizes the one-satisfaction rule. Cal.Code Civ.Proc. § 877[15] California courts applying § 877 have held that if the amount paid to an injured party equals or exceeds the amount of the loss, no claim remains against other joint tortfeasors. *E.g., Jaramillo v. California,* 81 Cal.App.3d 968, 970–71, 146 Cal.Rptr. 823 (1978).

Next, the Court must consider whether the single-satisfaction rule applies in the specific factual circumstances of this case. The rule explicitly states that an injured party's claim is diminished to the extent that payments are made "in compensation" for an injury. Thus, the rule by its terms does not apply in cases where a third party merely purchases the injured party's cause of action. The compensation requirement is met here, however, both on the face of the complaint and by counsel's admission at oral argument that B of A "stepped up to its responsibility and absolved the liability and took over the claims."

Not only does the one-satisfaction rule apply in this case, but so does the "discharge" rule of Restatement § 900(1)(b). That rule provides that if an injured party accepts one tortfeasor's payment as pay-

---

that is accepted by the injured party as payment in full for his injury. The cause of action is thus discharged, not only for him but for any tortfeasor who is liable for same injury."

**14.** Such a claim clearly is one that arises under state law. Since complete diversity is absent, subject matter jurisdiction exists only under this Court's discretionary pendent jurisdiction. *UMW v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). By granting leave to amend, I intimate no view on the issue of whether the exercise of pendent jurisdiction

would be proper here. *Id.* at 726, 86 S.Ct. at 1139.

**15.** Cal.Code Civ.Proc. § 877 states in pertinent part:

Where a release ... or a covenant not to sue ... is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort—

(a) ... it shall reduce the claims against the others in the amount stipulated by the release ... or the covenant....

ment in full, then all other tortfeasors are discharged from liability for the same injury. Here, the Bank's complaint admits to some degree of liability to the Investor Institutions; thus, it must be regarded as a "tortfeasor". It follows that the Bank's payments were made by a "tortfeasor"; consequently, § 900(1)(b) applies.

In sum, it appears that Restatement §§ 885(3) & 900(1)(b) ordinarily would have extinguished completely the Investor Institutions' claims against any other defendants as soon as the Bank paid off those Investor Institutions in full. However, the analysis must now turn to the more difficult aspect of this case, *i.e.*, whether and to what extent the purported assignments effect application of the Restatement rules.

There are surprisingly few reported cases that address the question presented here, *i.e.*, whether a party who has been fully compensated for an injury nonetheless may assign its claims to someone else. The parties here, after exhaustive research, have between them, cited to the Court only three federal cases arguably on point. I find persuasive the reasoning of *St. Paul Fire & Marine Ins. v. Michigan Nat'l Bank*, 660 F.2d 196 (6th Cir.1981), and *American Sur. Co. v. Bank of Calif.*, 133 F.2d 160 (9th Cir.1943), and reject the reasoning of the case primarily relied on by the Bank, *American Commercial Lines v. Valley Line Co.*, 529 F.2d 921 (8th Cir. 1976).

■ In *American Sur.*, an insurer had fully paid an insured party for its loss and subsequently took an assignment of that party's claims against a bank. The Ninth Circuit, applying Oregon law, first decided that the insurer was not entitled to equitable subrogation,[16] then decided that the

"assignment" did not give the insurer a right to sue the bank:

> If Insurers have no right to subrogation, their position is not improved by the assignments to them of insured's claim against Bank. When Insurers paid [the insured], the right of [the insured] to pursue its claim against Bank was destroyed as [the insured] would not be permitted a dual recovery. Therefore, there was in existence no enforceable claim against Bank which [the insured] could assign to Insurers, and which would support recovery in favor of Insurers.

133 F.2d at 164.

In *St. Paul Fire & Marine*, the Sixth Circuit applied Michigan law to a similar situation. There, St. Paul, acting as surety on a contractor's bond, paid the claim of a subcontractor that had been injured by a bank's untimely dishonor of the contractor's check. St. Paul then obtained from the subcontractor a release and an assignment of the subcontractor's claim against the bank. The Sixth Circuit held that St. Paul could not bring such an action as assignee because "after the underlying obligation had been satisfied by St. Paul, no cause of action against Michigan Bank remained in existence that could be assigned." 660 F.2d at 197. The court, citing *American Sur.*, also stated that:

> ... allowing an assignee to maintain a cause of action against one independently liable when the injured party has already received full compensation from another who is also liable would, in effect, give the injured party double recovery.

*Id.* at 199.

■ Two related principles emerge from these cases. First is the concern with

---

16. It does not appear that B of A would be entitled to equitable subrogation in this case. Although the Bank's complaint (¶ 6) states that the Bank has "succeeded to the claims of the Investor Institutions by operation of law," the Bank has not seriously pursued that argument. The argument must fail in any event, because under basic subrogation principles, subrogation applies only where "one person is required to pay a debt for which *another* is primarily responsible." *American Sur.*, 133 F.2d at 162 (emphasis added); Restatement of Restitution § 162 (1937). Here, although the Bank contends that defendants are the primary wrongdoers, the Bank's own complaint recognizes that it paid off its Investor Institutions in recognition of its own responsibilities towards them.

avoiding situations in which a plaintiff might effectively receive a double recovery. More importantly, however, these cases also expressly acknowledge something that should be quite obvious—once an injured party is fully compensated for its injury, whether by a tortfeasor or someone else, its claim is extinguished by operation of law, Restatement §§ 885(3) & 900(1)(b), comment *b,* and there simply is nothing remaining for the injured party to assign.[17]

■ B of A argues strenuously that the first of the above-described principles—the prohibition against double recovery—should not bar the assignments in the case at bench. The Bank urges the Court to take a "realistic view" of the instant case and recognize that there is no danger of an actual double recovery here by the assignor-Investor Institutions.[18] The Bank thus urges the Court to ignore the holdings of cases such as *American Sur.* and *St. Paul,* which the Bank characterizes as "embodying an anachronistically formal view of the law." However, even were I persuaded by the Bank's argument regarding double recovery, the Bank has not adequately refuted the other prong of the analysis—that once an injured party receives compensation for a claim, that party is left with nothing to assign.

The primary case relied on by the Bank, *American Commercial Lines,* is not convincing. In that case, two ships passed each other closely on the Mississippi River and one of the ships collided with some shoreline structures. The ship that actually struck the property (American), paid the injured property owners $33,000 in return for a release and an assignment of the injured parties' claims against the other ship (Valley). American then brought suit against Valley on the assigned claims. Valley argued that by releasing American, the injured parties also released Valley; therefore, that the injured parties had noth-

ing left to assign. A split panel rejected that argument, holding that in executing the release and assignment, the injured parties clearly intended to "(1) give a release of their claims against American ...; (2) retain, for purposes of giving an assignment, their claims against Valley; and (3) give an assignment of their claims against Valley to American." 529 F.2d at 925. The majority held that Valley's proposed construction of the agreements would render the assignment portion of each document a "meaningless act." *Id.*

With respect, I cannot accept the reasoning in *American Commercial.* First, the majority did not even consider the single-satisfaction rule, but instead grounded its decision on a contractual construction theory. Thus the case sheds no light on the legal principles that control the instant case. Moreover, by focusing on the intent of the parties, the decision contravenes Restatement § 885(3), which provides that a payment made in compensation of a harm diminishes the claim against other tortfeasors *"whether or not it is so agreed at the time of payment."* (Emphasis added.) *See also Screen Gems,* 453 F.2d at 554.

As stated previously, the Bank did not pay off its Investor Institutions for altruistic reasons. Rather, it is clear that the Bank, after its investigation of the NMEC pools, realized that it bore at least some of the responsibility for the Investor Institutions' losses. Had the Bank not reimbursed the Investor Institutions for their losses, it almost certainly would have found itself in the same position as Wells Fargo—a named defendant. As the Bank itself stated in its complaint:

The Bank recognized that the Investor Institutions would lose all or a significant portion of their investments in the NMEC pools. *In response to the Investor Institutions' demands,* the Bank undertook to resolve *its obligations to*

---

17. It is hornbook law that an assignee can acquire no greater right, title or interest than that enjoyed by its assignor. *E.g.,* 6 Am.Jur.2d, *Assignments,* § 119; 1 Witkin, Summary of Calif. Law, *Contracts* § 750, p. 627 (8th ed. 1973).

18. This argument fails to recognize that, for obvious reasons, the prohibition against double recovery applies as much to assignees of a claimant, as well as to the claimant itself.

*them* by repurchasing the Certificates or replacing the mortgages represented by the Certificates.

Comp., ¶ 55 (emphasis added). The Bank thereafter took these assignments, obviously hoping to recoup its losses from the defendants. This is precisely the type of situation that the law of contribution and indemnity is intended to govern.

It is critical to the course of this litigation that the parties be aligned properly. If the Bank is permitted to appear as a plaintiff bringing direct claims, rather than as a party seeking contribution or indemnity, it would have a profound effect on the other litigants' defenses, discovery, and overall strategies. Allowing the assignments in this case would permit the Bank to pursue theories of recovery it could not pursue in an action for indemnity or contribution. For example, the Bank has brought assigned claims that seek relief under the Securities Act of 1933. Those claims seek complete recovery for all losses the Investor Institutions may have sustained from violations of that Act. Absent the assignments however, the Bank would not be able to seek such a complete recovery, since the Ninth Circuit has denied a right to indemnification under the 1933 Act. *Laventhol, Krekstein, Horwath & Howath v. Horwitch,* 637 F.2d 672, 676 (9th Cir.1980), *cert. denied,* 452 U.S. 963, 101 S.Ct. 3114, 69 L.Ed.2d 975 (1981). The Bank's recovery would thus be limited to whatever proportionate share of the losses it could exact from the other defendants in an action for contribution. *Id.* at 674–75.[19]

The Court cannot permit such drastic alteration of the procedural and substantive posture of this litigation that would result from permitting these assignments to stand. As stated in the Restatement of Restitution § 86, comment *c*:

Neither in the case of indemnity nor in the case of contribution can a person obtain an advantage by taking an assign-ment of the claim of the injured person either before or after judgment.

The Court's conclusion is buttressed by a line of California cases holding that assignments may not be maintained in situations where, as here, the effect of the assignment would be somehow to circumvent restrictions imposed by the law of contribution. For example, California courts, as well as federal courts applying California law, have barred the assignment of claims where the practical effect of the assignment would have been to permit contribution between joint, intentional tortfeasors, to whom California expressly denies a right of contribution under Cal.Code Civ.Proc. § 875(d). *E.g., Bartneck v. Dunkin,* 1 Cal. App.3d 58, 61–62, 81 Cal.Rptr. 428 (1969); *Martinez v. De Los Rios,* 187 Cal.App.2d 28, 33–35, 9 Cal.Rptr. 326 (1960); *Bennett v. Dunn,* 504 F.Supp. 981, 986 (D.Nev. 1980). These cases confirm the fundamental principle that established tenets for apportioning damages between joint tortfeasors must be respected. No cogent reason has been advanced why that principle should not apply in this case with respect to the assigned federal securities claims, as well as the state law claims.

Finally, the policy argument that B of A asserts to justify these assignments is not convincing. The Bank argues it "did the right thing" by settling with its Investor Institutions, rather than forcing them to litigate their claims and that such settlements should be encouraged. However, the same laudable result can be achieved, while complying with the laws of contribution and indemnity. Those laws clearly permit a party in the Bank's position to recover from other wrongdoers without involving completely innocent parties in protracted litigation. The difference, however, is that unlike proceeding by way of assignments and bringing the Investor Institutions' claims in a plaintiff's posture, the Bank's potential recovery is limited, as

---

**19.** The Court expresses no opinion at this time as to which claims the Bank would be entitled to seek contribution or indemnity. Those ques-tions must await the filing of the amended complaint.

it should be, by the rules inhering in actions for contribution and/or indemnity.

## B. ASSIGNABILITY OF RICO CLAIMS

As explained more fully below, I conclude that while the one-satisfaction rule applies to RICO, it does not operate to extinguish fully the Investor Institutions' RICO claims in this case. I also conclude that the assignments of the RICO claims are valid. However, I conclude that B of A's RICO allegations are deficient. Accordingly, the RICO claims will be dismissed, but with leave to amend.

### 1. *Applicability of the One-Satisfaction Rule*

■ Although there appears to be no cases addressing the issue, the Court believes it quite clear that the basic principle expressed in the single-satisfaction rule is as applicable to a RICO claim as it is to any other claim by which a plaintiff seeks damages to redress an injury. The extent to which the rule extinguishes the Investor Institutions' RICO claims is complicated, however, by RICO's treble damage provision, 18 U.S.C. § 1964(c). To determine the proper scope of the rule's application in this case, the Court must answer the question, What constitutes "full satisfaction" of a treble damages claim?

■ There are two possible approaches to the problem. On the one hand, it can be argued that since the one-satisfaction rule diminishes a plaintiff's claim "at least to the extent of the payment made," Restatement § 885(3), the Bank's payments to the Investor Institutions should constitute compensation for only the first one-third of the treble damages to which the Investor Institutions would have been entitled under § 1964(c). Under this approach, the other two-thirds of the Investor Institutions' potential treble damage awards would remain unaffected by the one-satisfaction rule, and (assuming RICO claims are assignable) could be assigned to the Bank. Under the other possible approach, it could be argued that the Bank's payments to the Investor

Institutions constituted full compensation for any actual damages suffered by reason of any RICO violation; therefore, that the entire RICO claim should be deemed extinguished, because no actual damages remain, which could be trebled. I conclude the former approach is more likely to effectuate the purposes for which RICO was enacted.

The case at bar analytically is indistinguishable from an antitrust case in which a plaintiff sues multiple defendants for treble damages, settles with one or more of them and then prevails at trial against the remaining defendant(s). In such cases, the court must decide whether, in crediting the settlement payments against the treble damage award, to do so before or after the trebling of actual damages. Without exception, courts hold that the full award to which such plaintiffs are entitled is an amount three times the proven actual damages and that, to ensure that plaintiffs receive complete satisfaction of their claims, settlement payments should be deducted from the award against the non-settling defendant(s) *after* actual damages are trebled. *E.g., Flintkote Co. v. Lysfjord*, 246 F.2d 368, 398 (9th Cir.), *cert. denied*, 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). *Flintkote*, the first appellate case to consider this question, expressly addressed the relationship between the single-satisfaction rule and the treble damages provision of § 4 of the Clayton Act, 15 U.S.C. § 15:

Irrespective of the nature of the cause of action, a plaintiff is entitled to one full satisfaction of his claim in an action against joint defendants. In the case at bar ... *such satisfaction would not be achieved by the award of any sum, which added to the settlement sum, did not total [three times the jury's actual damage award].*

*Id.* (emphasis added). Thus, "[a]ny other method [of calculating damages] would have resulted in plaintiffs' receiving less than the whole to which they were entitled." *Id.*

Cases since *Flintkote* have uniformly accepted its rule. *E.g., Burlington Indus. Inc. v. Milliken & Co.,* 690 F.2d 380, 391–95 (4th Cir.1982), *cert. denied,* 461 U.S. 914, 103 S.Ct. 1893, 77 L.Ed.2d 283 (1983); *Hydrolevel Corp. v. American Soc'y of Mechanical Eng'rs, Inc.,* 635 F.2d 118, 130 (2d Cir.1980), *aff'd on other grounds,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982). In *Hydrolevel,* the Second Circuit cogently articulated the reasons why treble damage awards should not be diminished by settlement payments until *after* trebling:

First, the antitrust laws provide that the plaintiff should receive three times the proven actual damages. If settlement proceeds are deducted before trebling, the plaintiff's total award is less than what the law allows. Since antitrust defendants are joint tortfeasors, each is liable to complete the total deserved damages irrespective of fault. Second, ... one purpose of the trebling provision is to encourage private plaintiffs to bring suit. Any ultimate recovery totalling less than three times proven damages would weaken the statutory incentive through judicial construction. Third, deduction of settlement proceeds before trebling would discourage settlement by making litigation relatively more profitable for plaintiffs; every dollar received in settlement would cause a three dollar reduction in the judgment at trial.

*Id.*

The Court concludes that the *Flintkote* rule and its rationale are applicable to RICO treble damage claims. The Court acknowledges that the facts of the instant case differ somewhat from those of the antitrust cases cited above, since here, the Investor Institutions' actual damages were completely, rather than only partially, satisfied. However, that factual distinction does not alter the analysis, because the critical factor is that the "full satisfaction" to which treble damage claimants are entitled is "three times the proven actual damages"—any award less than that amount constitutes an incomplete recovery. Therefore, the Court concludes that the single-

satisfaction rule did not extinguish the Investor Institutions' RICO claims. However, it should be noted that under this rule, it is clear that if defendants ultimately are found liable on the assigned RICO claims, they are entitled to the "*Flintkote* credit," *i.e.,* that they may assert the Bank's payments to the Investor Institutions as an offset against the treble damage award.

### 2. *Should "Penal" Nature of RICO Damages Affect Assignability*

The question of whether a RICO treble damage claim is assignable apparently is one of first impression. The RICO statute itself is silent on the issue. Where a claim for relief is created by a federal statute, federal law governs the assignability of the claim. *In re Fine Paper Litig.,* 632 F.2d 1081, 1090 (3d Cir.1980) (assignability under Sherman and Clayton Acts a matter of federal law); *Isidor Weinstein Inv. Co. v. Hearst Corp.,* 303 F.Supp. 646, 649 (N.D.Cal.1969) (same).

B of A argues that in the absence of express statutory language, the court should look for guidance to analogous statutes, in this case to the antitrust laws. The Bank contends that, since it is well established that antitrust claims are assignable, *e.g. Hicks v. Bekins Moving & Storage Co.,* 87 F.2d 583, 585 (9th Cir.1937); *Jefferson County Pharm. Ass'n, Inc. v. Abbott Lab.,* 656 F.2d 92, 98 (5th Cir.1981); *D'Ippolito v. Cities Serv. Co.,* 374 F.2d 643, 647 (2d Cir.1967); *Louisiana Farmers' Protective Union v. Great A & P Tea Co.,* 131 F.2d 419, 423 (8th Cir.1942), and since the RICO treble damages provision clearly was modeled after the almost identical language found in § 4 of the Clayton Act, 15 U.S.C. § 15, *see Sedima, S.P.R.L. v. Imrex Co.,* —— U.S. ——, 105 S.Ct. 3275, 3280–81, 87 L.Ed.2d 346 (1985); *State Farm Fire & Cas. Co. v. Estate of Caton,* 540 F.Supp. 673, 680 (N.D.Ind.1982); *see generally* Cornell Institute on Organized Crime, *Techniques in the Investigation and Prosecution of Organized Crime* (G. Robert Blakey ed.) (1980) at 58–70 ("*Tech-*

*niques* "), it follows that RICO treble damage claims likewise should be assignable.

On the other hand, Lord Bissell argues that, rather than simply analogizing to antitrust law, the inquiry regarding RICO's assignability more properly should focus on the character of the RICO treble damages provision itself, 18 U.S.C. § 1964(c), to determine whether it is penal or remedial in nature. Lord Bissell asserts the following three-part argument: (1) the RICO treble damages provision is best characterized as penal, *see, e.g. Summers v. FDIC*, 592 F.Supp. 1240 (W.D.Okla.1984); *First Interstate Bank v. National Republic Bank* [1984–85 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 91,994 at 90,932–33 (N.D.Ill.1975); (2) actions for penalties do not survive the deaths of defendants, *see First Interstate Bank*, ¶ 91,994 at 90,932, or of plaintiffs, *see Smith v. No. 2 Galesburg Crown Fin. Corp.*, 615 F.2d 407, 414 (7th Cir.1980); and (3) traditionally, actions that are not survivable are not assignable. Prosser & Keeton, *Law of Torts*, § 126 at 944 (5th ed. 1984). *See Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 942, 132 Cal.Rptr. 424, 553 P.2d 584 (1976) (punitive damage claim not assignable under California law).[20] To buttress its argument as to the inappropriateness of the antitrust analogy, Lord Bissell points to language in *Hicks*, which seems to suggest that the underlying rationale for permitting the assignment of antitrust claims is that those claims are *not* penal and, therefore, are both survivable and assignable:

An action to recover damages [under the Sherman Act] is not an action to recover a penalty ... [s]uch a cause of action

does survive the death of the injured party and is assignable.

87 F.2d at 585 (citations omitted). *Accord, Gerr v. Schering Corp.*, 256 F.Supp. 572, 574 (S.D.N.Y.1966).[21]

We begin the analysis by examining the nature of the RICO treble damages provision. It is by no means clear that RICO treble damages are, in fact, penal in nature. The few courts that have directly addressed the question and attempted to characterize it have reached conflicting conclusions, even though each of those courts applied the same test. That test was first set out in *Murphy v. Household Fin. Co.*, 560 F.2d 206 (6th Cir.1977). There, the Sixth Circuit found the following factors to be of particular importance in determining whether a remedy is penal or remedial in nature: (1) whether the purpose of the statute is to redress individual wrongs or general wrongs to the public; (2) whether recovery under the statute runs to the individual or to the public; and (3) whether the authorized recovery is wholly disproportionate to the harm suffered. *Id.* at 209; *see also, Smith v. No. 2 Galesburg*, 615 F.2d at 414.

In applying this test, the court in *State Farm* concluded that the RICO treble damage provision is remedial in nature. With respect to the first factor, *State Farm* reasoned that since § 1964(c) specifically provides that any person injured by reason of a violation of § 1962 may sue for damages, the plain purpose of § 1964(c) must be to redress wrongs suffered by the individual. 540 F.Supp. at 681. The second

**20.** B of A has conceded that under California law it cannot pursue punitive damages under the assigned common law fraud claims.

**21.** Lord Bissell also argues that antitrust principles should not be applied to RICO because, while RICO is "penal" in nature, and has "criminal enforcement goals," the antitrust laws are "regulatory" in nature, with the "goals of regulating competition." This argument is derived from a portion of RICO's legislative history referred to in this Court's opinion in *Harper v. New Japan Sec. Int'l, Inc.*, 545 F.Supp. 1002, 1005 (C.D.Cal.1982). However, the antitrust laws, like RICO, provide for criminal penalties.

15 U.S.C. §§ 3, 24. And RICO, like the antitrust laws, was designed at least partially to promote competition, in RICO's case through stemming the infiltration into legitimate businesses by organized crime and by outlawing certain predatory business practices. In promulgating RICO, Congress explicitly found that "organized crime activities ... weaken the stability of the nation's economic system, harm innocent investors and competing organizations [and] interfere with free competition." 84 Stat. 922–23. Thus, the distinction Lord Bissell seeks to draw is illusory.

factor likewise indicates a remedial purpose, since recovery under § 1964(c) runs to the individual "with the obvious purpose of making him whole." *Id.* As for the third prong of the *Murphy* test, *State Farm* reasoned that the treble damage provision, rather than being wholly disproportionate to the injury, actually is compensatory because it serves to "liquidate uncertain damages and encourage the victim to bring suit...." *Id.* Finally, as an additional indication of § 1964(c)'s remedial nature, *State Farm* noted that Congress explicitly directed that RICO "shall be liberally construed to effectuate its remedial purposes", Pub.L. No. 91–452, § 452(a), 84 Stat. 947, and concluded that Congress "has explicitly denominated RICO remedial." *Id.*

Contrariwise, in both *Summers v. FDIC* and *First Interstate Bank,* the courts' analyses under the *Murphy* test led them to the opposite conclusion from that reached in *State Farm.* Indeed, both of those cases were quite critical of *State Farm*'s analysis. *Summers* and *First Interstate* both concluded that while the second *Murphy* factor is indicative of a remedial purpose, the other two factors suggest that RICO's treble damage provision is "primarily" penal. *Summers,* 592 F.Supp. at 1242–43; *First Interstate* ¶ 91,994, at 90,932–33. With respect to the first factor, *Summers* held that the findings and purpose of the Organized Crime Control Act of 1969 (Title IX of which is RICO), indicates that Congress expressly found that the problem of racketeering was public, not private. As for the third *Murphy* factor, *Summers* simply states that RICO treble damages are wholly disproportionate to the injury, "just as in the Clayton Act." 592 F.Supp. at 1242. However, *First Interstate*'s treatment of the third *Murphy* factor went beyond *Summers'* by expressly criticizing *State Farm*'s conclusion that § 1964(c) is compensatory. *First Interstate* instead found the congressional purpose behind § 1964(c) to be deterrence through "over-motivating" individuals to sue and thereby not only assuring that victims would receive compensation for their own injuries but also that they would "vindicate the public good by thwarting and deterring organized crime." [22] ¶ 91,994 at 90,932. Finally, *Summers* objected to *State Farm*'s interpretation of RICO's liberal construction provision. According to *Summers,* Congress did not explicitly characterize the treble damage provision as remedial. Although the liberal construction directive applies to RICO as a whole, it does not make the statute wholly remedial. Rather, it only directs courts not to apply to RICO the traditional rule of strict construction of penal statutes.

I am persuaded that *State Farm* states the better view. As the foregoing discussion indicates, RICO's treble damage provision, like the antitrust treble damage provision, is not readily susceptible of characterization as either "penal" or "remedial". Rather, it contains elements of both. The courts that have attempted to characterize § 4 of the Clayton Act as "penal" or "compensatory" also have reached divergent conclusions. *Compare Hydrolevel Corp.,* 635 F.2d at 127, *aff'd,* 456 U.S. 556, 102 S.Ct. 1935, 72 L.Ed.2d 330 (1982) (because antitrust damages are not really "punitive", it is proper to hold principal liable for acts of agent; "trebling of damages ... reflect congressional recognition of the difficulty of proving antitrust damages"); *Berkey Photo Inc. v. Eastman Kodak Co.,* 457 F.Supp. 404, 440 (S.D.N.Y.1978), *aff'd in part and rev'd in part,* 603 F.2d 263 (2d Cir.1979) (§ 4 of the Clayton Act not "penal" in sense it offends protections of the Fifth, Sixth or Eighth Amendments; trebling of damages is compensatory in "special sense" that it ensures wrongs do not go unredressed because of difficulty of proving damages); and *Momand v. Twentieth-Century Fox Film Corp.,* 37 F.Supp. 649, 657 (W.D.Okla.1941) ("right of action created by Section 7 of the Sherman Act is

---

**22.** The vitality of this argument has been severely undercut by the Supreme Court's later holding in *Sedima* that there is no prior conviction requirement in bringing a civil RICO claim and its rejection of any organized crime nexus as a requirement. 105 S.Ct. at 3282–84.

not a penalty but remedial ..."); *with Kline v. Coldwell, Banker & Co.,* 508 F.2d 226, 235 (9th Cir.1974), *cert. denied,* 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975) ("the trebling of damages ... is a statutory punitive measure"); *Rogers v. Douglas Tobacco Bd. of Trade,* 244 F.2d 471, 483 (5th Cir.1957) ("trebling of the damages seems to us to be in the nature of a penalty for the public wrong ..."); *Lyons v. Westinghouse Elec. Corp.,* 222 F.2d 184, 189 (2d Cir.), *cert. denied,* 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955) ("remedy provided is not solely civil; two thirds of the recovery is not remedial and inevitably presupposes a punitive purpose"); and *Acme Precision Prods., Inc. v. American Alloys Corp.,* 347 F.Supp. 376, 380 (W.D.Mo.1972), *rev'd on other grounds,* 484 F.2d 1237 (8th Cir.1973) ("trebling of damages against a violator of the antitrust laws is a punitive measure").

The Supreme Court also has indicated the hybrid nature of antitrust treble damages. In *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 485–86, 97 S.Ct. 690, 695–96, 50 L.Ed.2d 701 (1977), the Court noted that, while § 4 of the Clayton Act was designed primarily as a remedial provision, it also is true that treble damages play an important role in "penalizing wrongdoers and deterring wrongdoing." *See also Texas Indus. Inc. v. Radcliffe Materials, Inc.,* 451 U.S. 630, 639, 101 S.Ct. 2061, 2066, 68 L.Ed.2d 500 (1981) ("the very idea of treble damages reveals an intent to punish past, and to deter future, unlawful conduct ..."). And in *American Soc'y of Mechanical Eng'rs,*

*Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 575, 102 S.Ct. 1935, 1947, 72 L.Ed.2d 330 (1982), the Court again stated that while it is true that antitrust treble damages were partly designed as a punitive device, a private antitrust action is "primarily" a remedial provision for victims.

■ This review of the case law indicates that there is no clear-cut distinction in the cases as to whether antitrust treble damages are penal or remedial. The nature of the RICO treble damage provision is equally unclear. Nonetheless, such treble damage actions are almost universally considered assignable. Thus, it would appear that the crux of Lord Bissell's argument, *i.e.,* that the assignability of RICO claims is wholly dependent on the proper characterization of the treble damage provision as either punitive or remedial is untenable. This conclusion becomes all the more compelling in light of this Circuit's recognition that antitrust claims are assignable, despite the strong indication in *Kline,* 508 F.2d at 235, that antitrust treble damage awards are penal in nature.[23]

Having concluded that the penal-remedial dichotomy does not control a RICO claim's assignability, there is no reason why the court should not look to analogous antitrust law for guidance in construing RICO's treble damage provisions. While it is true that Congress did not intend to import all of existing antitrust law into RICO, it appears that Congress' intent in this regard was to keep from *restricting* RICO's reach by burdening private RICO litigants with antitrust concepts of standing and proximate cause.[24] Permitting the

---

**23.** Moreover, even in those circuits which hold that antitrust treble damages are penal, and therefore survive only for actual, not treble damages, treble damage claims still are considered assignable. *E.g.,* Second Circuit: *compare Vandervelde v. Put & Call Brokers & Dealers Ass'n,* 344 F.Supp. 118, 156–57 (S.D.N.Y. 1972) (treble damages are a penalty and do not survive for more than actual damages), *with D'Ippolito v. Cities Serv. Co.,* 374 F.2d 643, 647 (2d Cir.1967) (antitrust treble damage claim is assignable); Third Circuit: *compare Haskell v. Perkins,* 28 F.2d 222, 224 (D.N.J.1928) (treble damages are a penalty and do not survive for more than actual damages), *with In re Fine*

*Paper Litig.,* 632 F.2d 1081, 1090 (3d Cir.1980) (antitrust treble damage claim is assignable); Fifth Circuit: *compare Rogers v. Douglas Tobacco Bd. of Trade,* 244 F.2d 471, 483 (5th Cir.1957) (treble damages are a penalty and action does not survive for more than actual damages), *with Jefferson County Pharm. Ass'n [v. Abbott Laboratories],* 656 F.2d [92] at 98 [5th Cir.1981] (antitrust treble damage claim is assignable).

**24.** RICO originally was proposed as an amendment to the Sherman Act, prohibiting the investment or business use of unreported income. S. 2048, 90th Cong., 1st Sess. (1967) *reprinted in part* in *Techniques* at 72–73. The Antitrust Sec-

assignment of RICO claims, on the other hand, would not restrict RICO's scope, but would serve to effectuate RICO's "broad remedial purposes". Therefore, the Court holds that RICO treble damage claims are assignable.

### 3. *Availability of In Pari Delicto Defense*

■ Lord Bissell contends that there is no justification for permitting a RICO assignment in the particular circumstances of the case at bar. Lord Bissell argues that B of A is also a wrongdoer here and, as such, should not be rewarded with a "triple indemnification for its misconduct". This argument although not framed as such is, in essence, the assertion of the *in pari delicto* defense and can be answered by another analogy to antitrust law. The Supreme Court has held that the common law doctrine of *in pari delicto* is not a defense in antitrust treble damage actions. *Perma Life Mufflers, Inc. v. International Parts Corp.*, 392 U.S. 134, 88 S.Ct. 1981, 20 L.Ed.2d 982 (1968). The Court cautioned against "invoking broad common-law barriers to relief where a private suit serves important public purposes." *Id.* at 138, 88 S.Ct. at 1984. Thus, even though a plaintiff seeking treble damages in an antitrust suit may be as morally reprehensible as the defendant, his suit nonetheless should be encouraged to advance the predominate public policy in favor of competition. *Id.* at 139, 88 S.Ct. at 1984.

This reasoning is equally applicable to RICO treble damage actions. The fact, if it be a fact, that B of A may to some extent be embarking on this litigation with unclean hands should not by itself prohibit the Bank from bringing an action that otherwise advances RICO's broad anti-racketeering policies.[25]

Moreover, permitting the Bank to bring these assigned RICO claims (and the RICO claim brought in its own right as well), does not necessarily, as Lord Bissell contends, amount to permitting "one racketeer to sue another." *Lopez v. Dean Witter Reynold, Inc.*, 591 F.Supp. 581, 588 n. 4 (N.D.Cal.1984). In *Lopez*, the court hypothesized a situation where one member of a criminal "enterprise" lost control of the enterprise to other members. The court in *dicta* stated that the ousted racketeer would lack standing to sue his fellow racketeers under § 1962(b) (which proscribes the acquisition of an interest in an enterprise through a pattern of racketeering activity). While the *Lopez* hypothetical may be an example of the type of "complete involvement" under *Thi-Hawaii* that would bar a treble damage action, there is no indication here at the pleading stage that the Bank was so involved.[26]

tion of the American Bar Association urged that RICO be separated from the antitrust laws, in part because the antitrust laws could create obstacles to injured persons seeking treble damages. In particular, private litigants would need to contend with antitrust precedents creating strict standing and proximate cause requirements. House Hearings on S. 30, 91st Cong., 2d Sess. 149 (1970) *reprinted in part* in *Techniques* at 78–79. *See Harper*, 545 F.Supp. at 1005, for a brief synopsis.

**25.** The extent and nature of the Bank's participation in the alleged RICO violations may be relevant, assuming it turns out that defendants are entitled to raise the defense of "complete involvement." *See Thi-Hawaii, Inc. v. First Commerce Fin. Corp.*, 627 F.2d 991, 995 (9th Cir.1980). Whether, if defendants can show that the Bank's conduct amounted to "truly complete involvement and participation" in the alleged RICO violations, the Bank's treble dam-

age claim should be barred, is an issue not presently before the Court.

**26.** As an alternative argument against permitting the Bank to proceed with its RICO claim, Lord Bissell asserts that even if the Bank's role in the fraud is discounted and the Bank is considered to be a mere "unwitting tool" of a RICO enterprise, the Bank's claim still is barred by *Cenco, Inc. v. Seidman & Seidman*, 686 F.2d 449, 457 (7th Cir.), *cert. denied*, 459 U.S. 880, 103 S.Ct. 177, 74 L.Ed.2d 145 (1982). This argument is unavailing. *Cenco* is a standing case. It holds that the auditor of a criminal enterprise lacks standing to bring a cross-claim for damages under RICO against its client, the enterprise. Whether the Bank's conduct was witting or unwitting, it cannot be said that as a matter of law it is such a peripheral party that it only "suffered indirectly from the violation." *Id.* Moreover, this argument has no application to the assigned RICO claims.

## C. SUFFICIENCY OF THE RICO ALLEGATIONS

B of A's complaint contains a single RICO claim, with allegations that do not distinguish between the Bank's own RICO claim and the assigned claims. Each of the defendants has moved to dismiss the RICO claim for various reasons, which the court will discuss in turn.

Before discussing the individual grounds for dismissal, it is helpful first to review RICO's pleading requirements. To make out a civil RICO claim under § 1962(c), a plaintiff must plead the following elements: "(1) conduct (2) of an enterprise (3) through a pattern, i.e., at least two acts that are sufficiently related, (4) of racketeering activity." *Miller v. Glen & Helen Aircraft, Inc.*, 777 F.2d 496, 498 (9th Cir.1985), citing *Sedima*, 105 S.Ct. at 3285. Additionally, a civil RICO plaintiff must show that he was "injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).

### 1. *Injury "By Reason Of" a RICO Violation*

While it is clear that the "by reason of" language of § 1964(c) does not require allegation of a distinct "racketeering injury", *Sedima*, 105 S.Ct. at 3284–87, it is equally clear that the language "imposes a proximate cause requirement on plaintiffs." *Haroco v. American Nat'l Bank & Trust Co.*, 747 F.2d 384, 398 (7th Cir.1984), *aff'd*, — U.S. ——, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985). Thus, for a RICO claim to lie, the "criminal conduct in violation of section 1962 must, directly or indirectly, have injured the plaintiff's business or property." *Id.* Defendants argue that any injuries suffered here (either by the Bank or the Investor Institutions), did not result from any of defendants' alleged RICO violations, but from the Bank's own breaches of its fiduciary duties as escrow agent and trustee. Essentially, defendants are asking the court to rule at this prelimi-

nary stage of the litigation that the Bank is a supervening cause of the harms. The Court declines to make such a ruling.

This litigation promises to be enormously complex. The parties have estimated the number of documents related to this case at between a half million and a million, a number that is likely to rise as discovery proceeds. The Court believes it most inappropriate in a case of this nature to make such a fact-based determination as causation solely on the basis of the pleadings. More importantly, the complaint simply does not establish a lack of causation as neatly as defendants assume. The allegations do not foreclose the possibility that B of A was a concurrent cause, rather that a supervening cause, of the injuries.[27] While defendants' causation argument might ultimately prove to have merit, it is improper to assert such a fact-based argument in derogation of the complaint at the pleading stage.

### 2. *The Predicate Act Allegations*

B of A alleges securities fraud and mail and wire fraud as the predicate acts that constitute the "pattern of racketeering activity". Section 1961, which lists the acts that can constitute "racketeering activity", refers to any *offense* involving fraud in the sale of securities. Lord Bissell contends that liability for a securities "offense" must be based on willful violations of the securities laws, and that the Bank's allegations of reckless conduct are insufficient to support a finding of criminal securities violations. However, in this Circuit, "reckless disregard for truth or falsity is sufficient to sustain a finding of securities fraud" in a criminal case. *United States v. Farris*, 614 F.2d 634, 638 (9th Cir.1979), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980).

Next, all defendants challenge the predicate act allegations as deficient under F.R.Civ.P. 9(b). When the pattern of rack-

---

**27.** It is elemental that dismissal is improper "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

eteering includes fraud allegations, those allegations must comply with Rule 9(b)'s particularity requirements. *Bennett v. Berg*, 685 F.2d 1053, 1062 (8th Cir.1982), *aff'd en banc*, 710 F.2d 1361 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983); *Lopez*, 591 F.Supp. at 585. The Court concludes that B of A's complaint meets that standard.

This Circuit has stated that Rule 9(b) "does not require nor make legitimate the pleading of detailed evidentiary matter", but only requires "identification of the circumstances constituting fraud so that the defendant can prepare an adequate answer from the allegations." *Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir. 1973).[28] Even under this "relaxed" pleading standard, however, a complaint still must "identify the source of the fraud and distinguish among the defendants with respect to their roles in it." *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 645 (C.D.Cal.1983).

After reviewing the complaint, the Court concludes that the Bank's securities fraud allegations are as detailed as can be expected while still complying with Rule 8's command of "a short and plain statement of the claim." Defendants argue that the securities fraud-based claims consist of collective allegations that lump together the 19 assignor-Investor Institutions' claims and fail to specify *which* transactions involved *what* misrepresentations to *which* Investor Institution. Defendants want the Bank to make particularized allegations with respect to each individual transaction. However, such allegations would unduly lengthen the complaint. *See In re Nat'l Student Marketing Litig.*, 413 F.Supp. 1156, 1158 (D.D.C.1976). Moreover, the complaint does adequately identify the source of the fraud with respect to each of

the Investor Institutions' claims by listing specifically, by date, series number and amount invested, each of the Certificates allegedly purchased by the individual Investor Institutions. Additionally, appended to the complaint are "representative" copies of a PPM and a Pooling and Service Agreement, which also help identify the source of the alleged fraud and the nature of the misrepresentations. Contrary to what seems to be defendants' position, the Court does not, at the pleading stage, expect plaintiff to submit voluminous and extensive documentation for each of the 25 underlying transactions.

The complaint also contains multi-paragraph sections that identify the role of each defendant in the alleged fraud in a manner sufficient to allow defendants to prepare a responsive pleading. Nonetheless, Lord Bissell argues that the complaint contains only collective allegations of misrepresentations and omissions by all defendants, and does not attribute any specific misrepresentations to Lord Bissell and Michael. Those defendants argue that, as lawyers, they simply drafted the language of the PPM and cannot be responsible for the misrepresentations of other defendants found in those documents. However, the complaint does allege that Lord Bissell and Michael continued to prepare misleading PPM even after they received notice of the fraud in the form of a letter from Advance in December 1982, that outlined many of the deficiencies in the NMEC pools.

■ Next, the Court finds that the mail and wire fraud allegations also comply with Rule 9(b). The Bank adequately has alleged the essential elements of mail/wire fraud, which are the formation of a fraudulent scheme and use of the mails or interstate wires in furtherance of that scheme. *United States v. Bohonus*, 628 F.2d 1167,

**28.** *Miscellaneous Serv. Workers Local #427 v. Philco-Ford Corp.*, 661 F.2d 776, 782 (9th Cir. 1981), states that Rule 9(b) requires a pleader to set forth the "time, place and specific content of the false representations as well as the identities of the parties to the misrepresentation." However, I do not believe *Miscellaneous Serv. Workers* states the law of the Circuit. That case

relied on *Gottreich v. San Francisco Inv. Corp.*, 552 F.2d 866 (9th Cir.1977), which in turn, cited the *Walling* standard. At best, therefore, the precise Rule 9(b) standard in this Circuit is unclear. I conclude that the *Walling* standard is more consistent with the theory of the Federal Rules.

1171 (9th Cir.), *cert. denied,* 447 U.S. 928, 100 S.Ct. 3026, 65 L.Ed.2d 1122 (1980) (mail fraud); *United States v. Louderman,* 576 F.2d 1383, 1387 (9th Cir.), *cert. denied,* 439 U.S. 896, 99 S.Ct. 257, 58 L.Ed.2d 243 (1978) (wire fraud). Defendants maintain, however, that the complaint does not state the date, time or content of the communication but instead alleges only that "each of the defendants knowingly used the United States mails and/or interstate wire transmissions in furtherance of [the] scheme or artifice to defraud." Several courts have dismissed RICO claims, in whole or in part, on these grounds. *E.g., McKee v. Pope Ballard Shepard & Fowle, Ltd.,* 604 F.Supp. 927, 930 (N.D.Ill.1985); *Lopez,* 591 F.Supp. at 585. However, as discussed above, such allegations are not necessarily required in this Circuit. Moreover, the Court agrees with the reasoning of *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.,* 742 F.2d 786 (3d Cir.1984). That case considered the identical argument that defendants make here and decided that while including allegations of time, place and date is one method of vindicating the policies of Rule 9(b), such allegations neither are required by the rule, nor are they the only way to effectuate the rule's policies. *Id.* at 791. The court held that because plaintiff's other allegations were made with great specificity, the complaint as a whole adequately described the nature and circumstances of the alleged misrepresentations; thus, satisfying Rule 9(b). *Id.*

This Court concludes that *Seville*'s flexible approach is appropriate in the case at hand. The Bank's complaint as a whole gives defendants adequate notice of the basis of the mail and wire fraud charges. Of course, to prevail on its RICO claim the Bank eventually will have to prove that the defendants made specific mailings or wire communications in furtherance of the fraudulent scheme and the Bank's claim as to what such mailings and communications were will be subject to discovery. While the Court believes the notice pleading requirements of the Federal Rules make it unnecessary for the Bank now to plead those specifics, the Court expects that the

Bank's contentions in this regard will have been crystallized and clarified for defendants by the time of the pretrial conference.

Defendants make an additional, related argument with respect to the mail and wire fraud allegations. Section 1961(1)(A) refers to any act *indictable* under the relevant mail or wire fraud statutes. Defendants argue that for an act to be indictable, it must be supported by enough specificity to show probable cause that a crime has been committed and that to find probable cause a court can require a bill of particulars. *See Bache Halsey Stuart Shield Inc. v. Tracy Collins Bank & Trust Co.,* 558 F.Supp. 1042, 1045–46 (D.Utah 1983). This Court declines to embrace such an approach. As mentioned before, the Bank adequately has pleaded the elements of mail and wire fraud in accordance with the Federal Rules of Civil Procedure. For reasons previously stated, the Bank will not at this point be required to list specifically the communications it will attempt to prove.

3. *The "Pattern" of Racketeering Activity*

 Although their argument is somewhat difficult to follow, defendants West Pac and Rogers appear to contend that B of A has not pleaded adequately a "pattern" of racketeering activity. This contention is meritless. In *Sedima,* 105 S.Ct. at 3285 n. 14, the Supreme Court noted that a "pattern" is not established merely by pleading two isolated acts of racketeering activity. Rather, "it is [the] factor of *continuity plus relationship* which combines to produce a pattern." *Id.* (emphasis in original). Subsequent cases have held that continuity is established by proof that the predicate acts occurred in different criminal episodes, while relatedness requires a showing of "common perpetrators, common methods of commission, or common victims." *Allington v. Carpenter,* 619 F.Supp. 474, 478 (C.D.Cal.1985) (citations omitted). Under this standard, the Bank properly has pleaded a "pattern" of racketeering activity.

#### 4. The "Enterprise"

The leading case dealing with RICO's "enterprise" requirement is *United States v. Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981). In an oft-quoted passage, the Court stated:

> The enterprise is an entity, for present purposes a group of persons associated together for a common purpose of engaging in a course of conduct. The pattern of racketeering activity is, on the other hand, a series of criminal acts as defined by the statute ... The former is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit. The latter is proved by evidence of the requisite number of acts of racketeering committed by the participants in the enterprise. While the proof used to establish these separate elements may in particular cases coalesce, proof of one does not necessarily establish the other. The "enterprise" is not the "pattern of racketeering activity"; it is an entity separate and apart from the pattern of activity in which it engages.

*Id.* at 583, 101 S.Ct. at 2528.

There is a well known split among the Circuit's as to the proper application of *Turkette*'s "enterprise" standards. The Third, Fourth and Eighth Circuits, each employing slightly different formulations, require proof of an "enterprise" that has an independent, identifiable existence separate and apart from that necessary merely to engage in the acts constituting the pattern of racketeering activity. *See United States v. Tillett,* 763 F.2d 628, 631 (4th Cir.1985), *cert. denied,* 454 U.S. 1156 (1982); *United States v. Riccobene,* 709 F.2d 214, 223–24 (3d Cir.), *cert. denied,* 464 U.S. 849, 104 S.Ct. 157, 78 L.Ed.2d 145 (1983); *United States v. Bledsoe,* 674 F.2d 647, 665 (8th Cir.1982), *cert. denied,* 459 U.S. 1040, 103 S.Ct. 456, 74 L.Ed.2d 608 (1983). Other circuits, led by the Second, have rejected this view. Those courts have seized on *Turkette*'s "coalesce" language to apply RICO "to situations where the enterprise was, in effect, no more than the sum of the predicate racketeering acts." *United States v. Bargaric,* 706 F.2d 42, 55 (2d Cir.), *cert. denied,* 464 U.S. 840, 104 S.Ct. 133, 78 L.Ed.2d 128 (1983); *see also United States v. Cagnina,* 697 F.2d 915, 921 (11th Cir.1983) (rejecting Eighth Circuit view).

The Ninth Circuit's position in this debate in unclear; the cases do not squarely address the issue. *See United States v. DeRosa,* 670 F.2d 889, 896 (9th Cir.), *cert. denied,* 459 U.S. 993 & 1014, 103 S.Ct. 353 & 372, 74 L.Ed.2d 391 & 507 (1982); *United States v. Bagnariol,* 665 F.2d 877, 890 (9th Cir.1981), *cert. denied,* 456 U.S. 962, 102 S.Ct. 2040, 72 L.Ed.2d 487 (1982). Although some courts and commentators have read these Ninth Circuit decisions as rejecting the Eighth Circuit's formulation, *see, e.g., Cagnina,* 697 F.2d at 921, the Court believes this Circuit's decisions are ambiguous.

■ Recently, in *Allington,* the court analyzed and compared the Eighth and Second Circuits' positions and concluded that the Eighth Circuit's view "is more consistent with statutory language and congressional intent." 619 F.Supp. at 479. This Court agrees with *Allington*'s analysis and its conclusion, and for the reasons set forth in that opinion, the Court holds that a civil RICO plaintiff must plead and prove an enterprise with "an ascertainable structure distinct from that inherent in the conduct of a pattern of racketeering." *Bledsoe,* 674 F.2d at 665.

■ In the case at bench, B of A's complaint alleges that all defendants violated § 1962(c), which prohibits persons from conducting or participating in directly or in indirectly, the conduct of an enterprise through a pattern of racketeering activity. However, the "enterprise" is alleged to be nothing more than "a continuing unit for the common purpose of engaging in a conspiracy to defraud designed to induce the Investor Institutions to purchase the mortgage-backed Certificates and to induce the Bank to serve as escrow agent and trustee in connection with fraudulent securities

transactions." Comp., ¶ 80. These allegations clearly fail to allege an enterprise distinct from the predicate acts; what the Bank really has alleged is "a conspiracy rather than an enterprise." *Allington,* 619 F.Supp. at 479. Accordingly, the Bank has failed to state a claim under RICO § 1962(c).

### 5. *Section 1962(d) Conspiracy*

 The complaint also alleges a RICO conspiracy in violation of § 1962(d), which, among other things, makes it unlawful to conspire to conduct the affairs of an enterprise through a pattern of racketeering activity. As just described, the Bank has not pleaded an enterprise but merely a conspiracy to commit the predicate acts; Section 1962(d) does not proscribe conspiracies to conspire. *See Allington, id.* Further, because of § 1964(c)'s "injury" requirement, "in order for a plaintiff to have a private cause of action under 18 U.S.C. § 1962(d), there must at the very least be one or more overt acts causing injury to the plaintiff or 'his business or property' under 18 U.S.C. § 1964(c)." *Medallion TV Enter., Inc. v. Selec TV of Calif., Inc.,* 627 F.Supp. 1290, 1298 (C.D.Cal.1986). *Cf. United States v. Tille,* 729 F.2d 615, 619 (9th Cir.1984) (proof of agreement alone sufficient to establish violation of § 1962(d) in *criminal* prosecution). No such allegation of an injury-causing overt act in furtherance of the alleged RICO conspiracy is made here. *Cf. Hennegin v. Pacifico Creative Serv., Inc.,* 787 F.2d 1299 (9th Cir.1986) (antitrust plaintiff may pursue action only for recovery of damages from overt acts which occurred within period of limitations). Thus, the RICO conspiracy claim must also be dismissed.

### IV. CONCLUSION

For the reasons discussed above, I conclude that the tort and securities claims asserted under state law and all federal claims, except the RICO claims, which B of A brings as assignee of the Investor Institutions, are barred, in their assigned form, under the single-satisfaction rule. B of A, however, is not necessarily barred on the facts now before the Court from pursuit of its remedies against any asserted joint tortfeasors under the laws of indemnity and contribution. Because payment by B of A to the Investor Institutions has not fully satisfied the latter's claims under RICO, the single-satisfaction rule bars neither the assignment of the Investor Institutions' RICO claims nor their prosecution by the Bank. And federal law does not otherwise prohibit the assignment of RICO treble damage claims. However, the Bank's single RICO claim (which does not distinguish between its own claim and the assigned claims) is deficient in failing adequately to allege a RICO "enterprise" and a RICO conspiracy. Leave to amend will be granted to allow B of A the opportunity to amend its complaint in accordance herewith.

IT IS ORDERED, that the First, Second, Third, Fourth, Fifth and Sixth Claims of Bank of America's Complaint are dismissed with 30 days' leave to amend; in all other respects, the motions to dismiss said complaint are denied.

### MEMORANDUM OPINION II AND ORDER

### I. PRELIMINARY STATEMENT

By its Memorandum Opinion and Order ("Memo.Op. I"), filed May 13, 1986, the Court ruled on the motions to dismiss the Complaint of B of A.[1] This opinion addresses the motions to dismiss the Complaints of Riverhead, Missouri and First Federal (collectively the "Savings Banks" or "plaintiffs") and Missouri's and First Federal's motions to dismiss certain counterclaims.

The pertinent allegations were set forth in Part II of Memo.Op. I, at 1144–1146, 636 F.Supp. 1138 (C.D.Cal.1986). However, one further fact, not previously mentioned, is relevant to the disposition of these motions. Riverhead did not purchase its Certificate directly from NMEC (or

---

**1.** The terminology used in Memo.Op. I also will be used throughout this opinion.

Wells Fargo or Advance). Rather, the first purchaser of that Certificate (which evidenced an interest in the Series "C" pool) was Umpqua Savings and Loan Association ("Umpqua"), which purchased the Certificate in April, 1982. Subsequently, in April, 1984, Riverhead purchased its Series "C" Certificate from Umpqua, through the latter's broker MEBAC. Riverhead has included both Umpqua and MEBAC as defendants in its action.

## II. DISCUSSION

### A. ARE THE CERTIFICATES "SECURITIES"

Defendants contend that the federal and state securities law claims should be dismissed because the Certificates are not "securities" within the meaning of the securities laws.[2] They contend that NMEC's mortgage pool program represents a conventional commercial lending transaction in which the Savings Banks agreed to participate in loans made to the underlying mortgagors, rather than an investment of capital that would be covered by the securities laws. Thus, the issue in this case is whether the Certificates constitute "investment contracts" as that term is used, e.g., in § 2(1) of the 1933 Act, 15 U.S.C. § 77b(1).[3] The classic formulation for determining whether a contract is one for investment was first set out in *SEC v. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 1104, 90 L.Ed. 1244 (1945):

> The test is whether the scheme involves [1] an investment of money [2] in a common enterprise [3] with profits to come solely from the efforts of others.[4]

This Circuit has also adopted a "risk capital" test to determine if a transaction involves a security. *Great W. Bank & Trust v. Kotz*, 532 F.2d 1252 (9th Cir.1976). The parties dispute whether and to what extent application of the risk capital test is appropriate here. The Court concludes that, in the circumstances alleged here, risk capital analysis is required to determine if the "investment" prong of *Howey* is satisfied. Thus, in effect, the Certificates must satisfy both standards.

■ As the Ninth Circuit has stated on several occasions, risk capital analysis combines the Supreme Court's "economic realities" standard[5] with this Circuit's emphasis on an expectation of profit from the entrepreneurial efforts of others. *Underhill v. Royal*, 769 F.2d 1426, 1431 (9th

---

**2.** In determining whether or not a "security" is involved, it is unnecessary to distinguish between the applicable securities laws. The definitions of "security" are virtually identical under both the Securities Act of 1933 (the "1933 Act"), and the Securities Exchange Act of 1934 (the "1934 Act"), and are treated as such. *Landreth Timber Co. v. Landreth*, —— U.S. ——, 105 S.Ct. 2297, 2302 n. 1, 85 L.Ed.2d 692 (1985). In addition, California courts look to federal case law as authority in interpreting the definitions of "security" under California law. *People v. Schock*, 152 Cal.App.3d, 379, 387, 199 Cal.Rptr. 327 (1984); *Hamilton Jewelers v. Department of Corporations*, 37 Cal.App.3d 330, 333, 112 Cal. Rptr. 387 (1974).

**3.** Plaintiffs do not contend that the Certificates are "notes" within the meaning of the securities laws. However, they do argue that the Certificates evidence the kind of "interest or participation" in a note, *i.e.*, the underlying mortgage-backed notes, or in a profit sharing agreement, *i.e.*, the pooling and service agreement, that would bring the Certificates within the definition of a security found in § 2(1) of the 1933 Act, 15 U.S.C. § 77b, or § 3(a)(10) of the 1934

Act, 15 U.S.C. § 78c(a). *See Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 434 (9th Cir.1978). But the Savings Banks advance this argument only as part of their apparent attempt to convince the Court to adopt the Second Circuit's "plain meaning" or "literalist" approach in defining a security. *See Exchange Nat'l Bank v. Touche Ross & Co.*, 544 F.2d 1126 (2d Cir.1976). Since *Touche Ross* obviously does not represent the law of this Circuit, the Court will not consider further this argument.

**4.** Although the *Howey* test arose in the context of defining an "investment contract," the Court since has indicated that the test, "in shorthand form, embodies the essential attributes that run through all of the Court's decisions defining a security." *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975).

**5.** In *Forman*, the court stated that the application of the securities laws should turn on "the economic realities underlying a transaction, and not on the name appended thereto." 421 U.S. at 849, 95 S.Ct. at 2059.

Cir.1985); *United Calif. Bank v. THC Fin. Corp.*, 557 F.2d 1351, 1358 (9th Cir.1977). The purpose of the risk capital test is to ascertain if the purported "investment" in a "security" is in reality nothing more than a commercial lending transaction. *United States v. Carman*, 577 F.2d 556, 563 & n. 9 (9th Cir.1978). Thus, the ultimate inquiry under the test is whether the funding party "contributed 'risk capital' subject to the 'entrepreneurial or managerial efforts' of [others]." *Kotz*, 532 F.2d at 1257; *United Calif. Bank*, 557 F.2d at 1358.

■ In *Kotz*, the court compiled a non-exhaustive list of six factors, none of them dispositive, to be utilized in distinguishing between transactions that are "risky loans", and thus exempt from the securities laws, and investments of "risk capital", which are not. The *Kotz* factors are: (1) time; (2) collateralization; (3) form of the obligation; (4) circumstances of issuance; (5) relationship between the amount borrowed and the size of the borrower's business; and (6) contemplated use of the proceeds. 532 F.2d at 1257–58.

The test is not applied in cases where the "investment" prong of *Howey* either clearly is satisfied or is not a matter of dispute, *see, e.g., SEC v. Goldfield Deep Mines*, 758 F.2d 459, 463 (9th Cir.1985); *Brodt v. Bache & Co., Inc.*, 595 F.2d 459 (9th Cir. 1978); *Wright v. Schock*, 571 F.Supp. 642, 648 (N.D.Cal.1983), or where the existence of a commercial loan is not alleged. *Carman*, 577 F.2d at 563. None of those circumstances is present here. Rather, this is the paradigmatic case in which to apply risk capital analysis. That analysis will be applied primarily to determine whether the Certificates are investments or commercial loans, *i.e.*, to isolate *Howey* 's "investment" prong.

> The risk capital test is … an adaptation and elaboration of *Howey* which is particularly applicable to the characterization of certain types of transactions. It can lead and most often has lead to the con-

clusion that a given transaction is not an investment in securities but a commercial loan.

*Wright v. Schock*, 571 F.Supp. at 648. This approach also is consistent with *El Khadem v. Equity Securities Corp.*, 494 F.2d 1224 (9th Cir.) *cert. denied*, 419 U.S. 900, 95 S.Ct. 183, 42 L.Ed.2d 146 (1974), where the court first decided that plaintiff had provided defendant with risk capital, and then went on to consider the other *Howey* factors.[6]

■ Reviewing the allegations of the Savings Banks' complaints in the light most favorable to them, I cannot say that, as a matter of law, they fail sufficiently to allege facts to meet the *Howey* test, as amplified by the *Kotz* six-factor analysis. While it is true that if the complaint clearly discloses that the transaction pleaded is not a "security", dismissal for failure to state a claim upon which relief can be granted is proper, *Amfac Mortgage Corp. v. Arizona Mall of Tempe, Inc.*, 583 F.2d 426, 430 (9th Cir.1978), because the issue of whether a security exists presents a mixed question of fact and law, *SEC v. Goldfield Deep Mines*, 758 F.2d at 463, it is not unusual for resolution of the issue to require development of an evidentiary record of some kind. *See, e.g., Underhill v. Royal*, 769 F.2d 1426 (summary judgment); *United States v. Farris*, 614 F.2d 634 (9th Cir.1979), *cert. denied*, 447 U.S. 926, 100 S.Ct. 3022, 65 L.Ed.2d 1120 (1980) (trial); *Brodt v. Bache & Co.*, 595 F.2d 459 (summary judgment); *United States v. Carman*, 577 F.2d 556 (trial). Here, resolution of the issue must be deferred, pending further factual development. First and foremost, the Court does not have before it any of the documents necessary to characterize these transactions. None of the Savings Banks has attached to its complaint copies of the respective Pooling and Service Agreements ("PSA") or PPMs, presumably the most relevant documents. B of A did attach a "representative" copy of both a PSA and

---

**6.** Although *El Khadem* was decided before *Kotz*, its analysis is consistent with *Kotz*. In fact, *Kotz* cited *El Khadem* in stating, "[t]he inquiry is whether the funding party invested 'risk capital.'" 532 F.2d at 1257.

**1164**

PPM to its complaint, but even were the Court to consider those documents, factual issues still would remain because the parties have indicated that the various Investor Institutions and Savings Banks may have received different versions of both the PSA and the PPM.

In addition, there remain open factual questions that go to elements of both the *Kotz* and *Howey* tests. For example, the nature and extent of any negotiations is important in determining whether or not the transaction is a commercial lending arrangement. Defendants maintain that each Certificate was issued after separate face to face negotiations but there is nothing before the Court concerning what transpired in those negotiations.

Finally, this case is quite different from *Amfac*. There, not only was the court supplied with the relevant "basic documents," but the transaction itself involved a relatively straightforward construction financing arrangement. 583 F.2d at 430. Here, by contrast, the Court is faced with a complex financing scheme in which numerous parties played key roles. Therefore, all that can be concluded now is that the claim is sufficiently pleaded to withstand a Rule 12(b)(6) motion, *i.e.*, the issue cannot be resolved at the pleading stage.

### B. SUFFICIENCY OF FRAUD ALLEGATIONS

■ Lord Bissell and NMEC contend that the fraud allegations do not comply with the particularity requirement of F.R. Civ.P. 9(b). Taken as a whole, the allegations of each complaint adequately identify the circumstances constituting fraud. *See Walling v. Beverly Enterprises*, 476 F.2d 393, 397 (9th Cir.1973). *Cf.* Memo Op. I, Part III.C.2 (alleging fraud as RICO predicate act). Although the complaints are fairly general in some respects, they do identify the source of the fraud as Lord Bissell's opinion letter and the PSA, and also allege numerous specific misrepresentations and omissions by the defendants. The complaints also sufficiently "distinguish among the defendants with respect to their roles" in the fraud. *Hokama v. E.F. Hutton & Co., Inc.*, 566 F.Supp. 636, 645 (C.D.Cal.1983). Further, the allegations made on information and belief are supported by enough factual contentions to pass muster under Rule 9(b). *See MacFarland v. Memorex Corp.*, 493 F.Supp. 631, 639 (N.D.Cal.1980).

■ Lord Bissell and Michael also contend that, at best, Riverhead pleads only a misrepresentation from Lord Bissell to Umpqua and not to Riverhead. This contention ignores the allegation that Lord Bissell still was NMEC's counsel in April, 1984, when Riverhead obtained its interest in the Series "C" pool pursuant to a Second Amendment to the PSA. It also ignores Michael's continuing relationship with NMEC through 1984.

■ Lord Bissell also argues that to the extent Missouri's and First Federal's common law fraud claims are based on an alleged failure to disclose material facts, they must fail because mere nondisclosure is not actionable unless the defendant is a fiduciary with a duty to disclose. However, the sentence in Witkin's California Procedure on which Lord Bissell relies is followed immediately by this sentence: "But *active concealment or suppression* of facts by a nonfiduciary is the equivalent of a false representation, *i.e.*, *actual fraud.*" 3 Witkin, California Procedure, *Pleading* § 582, p. 2220 (2d ed. 1971) (emphasis in original).

### C. SECTION 10(b) AND RULE 10b–5 CLAIMS

Each of the complaints allege violations of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5. Missouri and First Federal allege primary and aiding and abetting liability on the part of all defendants. Missouri claims Michael also is liable as a control person of NMEC, while First Federal alleges control person liability on the part of both Feldman and Michael. Riverhead charges all defendants, except Feldman, with primary and aiding and abetting

liability, and also charges Feldman and Michael with control person liability. Lord Bissell and Michael contend that these claims are, at least with respect to them, deficient in several respects.

First, they contend that to the extent the Rule 10b–5 claims are based on alleged misrepresentations, the Savings Banks have not pleaded any false representations by Lord Bissell. The Court rejects this contention for the reasons previously stated in Part II.B, above.

■■■■■ Next, Lord Bissell and Michael argue that they are not liable under an omissions theory of Rule 10b–5, because the Savings Banks have not alleged a duty to disclose on their part. A defendant's duty to disclose under Rule 10b–5 is determined by the five-part test of *White v. Abrams*, 495 F.2d 724, 735 (9th Cir.1974). The factors under that test are: (1) the defendant's relationship to the plaintiff; (2) the defendant's access to the information as compared to the plaintiff's access; (3) the benefit the defendant derives from the relationship; (4) the awareness by the defendant of the plaintiff's reliance on him; and (5) the defendant's activity in initiating the transaction. This test is not to be applied rigidly, but envisions "a broad continuum ranging from fiduciaries, whose affirmative duty of disclosure is unparalleled, to complete strangers, who need only refrain from intentional misrepresentations." *Stephenson v. Calpine Conifers II, Ltd.*, 652 F.2d 808, 813 (9th Cir.1981). Here, the complaints allege a close relationship between these defendants and NMEC. The Savings Banks have alleged that Michael was a principal shareholder and officer of NMEC, and that Michael and Lord Bissell participated in both the sales of the Certificates and the preparation of the supporting documentation. If proved, these allegations could give rise to a duty to disclose under the *White v. Abrams* test, depending on the extent of Lord Bissell and Michael's

involvement with NMEC and the defendants' relationship to the plaintiffs. *See Wright v. Schock*, 571 F.Supp. at 663.

■■■■ Lord Bissell and Michael also challenge the aid and abet allegations based on the purported absence of a duty to disclose. They argue that absent such a duty, liability can only be imposed "if scienter of the high 'conscious intent' variety can be proved," *Woodward v. Metro Bank*, 522 F.2d 84, 97 (5th Cir.1975), and that plaintiffs' allegations of recklessness are insufficient. This contention must fail. First, because the Rule 10b–5 claims incorporate all of the general allegations of the complaints, plaintiffs' aid and abet allegations are based not just on an omissions theory but also on affirmative misrepresentations. Further, to the extent the aid and abet allegations are based on omissions, they still are sufficient. Plaintiffs plead, in the alternative to recklessness, both actual knowledge of the fraud and knowing participation in it. These allegations of scienter give rise to a duty to disclose. *See Harmsen v. Smith*, 693 F.2d 932, 944 (9th Cir.1982), *cert. denied*, 464 U.S. 822 (1983), 104 S.Ct. 89, 78 L.Ed.2d 97 ("the secondary violator's duty [to disclose] arises from knowing assistance of or participation in a fraudulent scheme").[7]

■■■■ Finally, Michael challenges the sufficiency of the control person allegations. *See* § 20(a) of the 1934 Act, 15 U.S.C. § 78t(a). This Circuit has stated that:

A controlling person is liable for the acts of another if the controlling person "acted in bad faith and directly or indirectly induced the conduct constituting a violation or cause of action" ... there can be no liability if the controlling person "was not a participant in ... activities which are claimed to violate the securities laws"....

based on insider status or a fiduciary or similar relationship." *Hudson v. Capital Management Int'l, Inc.*, 565 F.Supp. 615, 624 (N.D.Cal.1983); *Hokama*, 566 F.Supp. at 642.

---

7. Because plaintiffs have pleaded actual knowledge as scienter, the Court need not reach the question of whether plaintiffs' recklessness allegations are sufficient. Recklessness suffices if a defendant is under a "special duty to disclose

*Burgess v. Premier Corp.*, 727 F.2d 826, 832 (9th Cir.1984) (citations omitted). Although mere titles are not enough to demonstrate control person authority, *id.* (director not automatically liable as control person); *MacFarland v. Memorex Corp.*, 493 F.Supp. at 649, a plaintiff need not plead "specific affirmative acts" of control. *Hudson v. Capital Management Int'l, Inc.*, [1982–83 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 99,222 at 95,905 (N.D.Cal. 1982) (citation omitted) (*"Hudson I"*). It is sufficient to inform defendants "who they are alleged to control and what acts or status indicate such control." *Id.*

This Circuit expressly has declined to decide whether § 20(a) requires a showing of "culpable" participation by the control person in the activities of those controlled. *Christoffel v. E.F. Hutton & Co., Inc.*, 588 F.2d 665, 669 (9th Cir.1978). Moreover, it is not plaintiff's burden to plead that a defendant acted in "bad faith". The "bad faith" language of *Burgess* and other cases appears to refer to "the *defense* of good faith made available by the terms of Section 20(a)." *Zweig v. Hearst Corp.*, 521 F.2d 1129, 1133 (9th Cir.), *cert. denied*, 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975) (emphasis added).

Under the principles outlined above, the Court concludes that the Savings Banks' control person allegations are sufficient. Plaintiffs allege not just that Michael was an officer of NMEC, but also that he was a principal shareholder of what appears to have been a closely held corporation. The complaints also allege that Michael participated in the organization of NMEC and in the offer and sale of the Certificates with knowledge that the PSAs were misleading.

### D. SECTION 12(1) CLAIMS

#### 1. *Statute of Limitations*

Plaintiffs allege violations of § 12(1) of the 1933 Act, 15 U.S.C. § 77*l* (1). That provision imposes liability on those who offer or sell unregistered securities in violation of § 5 of the 1933 Act, 15 U.S.C. § 77e. Lord Bissell contends that First Federal's and Missouri's § 12(1) claims are barred by the limitations period of § 13 of the 1933 Act, 15 U.S.C. § 77m.

Section 13 requires a § 12(1) action to be brought within one year after the violation of § 5 and "in no event … more than three years after the security was bona fide offered to the public." It is plaintiffs' burden affirmatively to plead facts showing compliance with § 13's limitations periods. *Toombs v. Leone*, 777 F.2d 465, 468 (9th Cir.1985). Further, the one-year and three-year periods are cumulative, not alternative, *i.e.*, plaintiff must demonstrate compliance with both periods. *Morley v. Cohen*, 610 F.Supp. 798, 815 (D.Md.1985).

The statute begins to run from the date of defendant's last sales-related activity, *i.e.*, offer, sale or delivery of the security. *Toombs v. Leone*, 777 F.2d at 968; L. Loss, *Fundamentals of Securities Regulation*, 1164 (1983) (*"Loss"*). In this case, First Federal purchased its Series "B" pool Certificate on March 23, 1982, while Missouri purchased its Series "A" pool Certificate on January 29, 1982, and its Series "D" pool Certificate on July 15, 1982. Since both plaintiffs filed their complaints on March 22, 1985, more than one year after the last sales-related activity alleged, their § 12(1) claims are time barred unless, as plaintiffs argue, the claims can be saved by the doctrine of fraudulent concealment.

This Circuit has not decided the question whether § 13's one-year limitation on § 12(1) actions can be equitably tolled by fraudulent concealment. Lord Bissell points to *SEC v. Seaboard Corp. (Admiralty Fund v. Hugh Johnson & Co., Inc.)*, 677 F.2d 1301, 1308 (9th Cir.1982), as authority that the one-year period is absolute. However, that case held only that § 13's three-year period is not subject to equitable tolling, and thus is inapposite to the issue under discussion.

While some of the other courts that have directly addressed the question have held that the one-year period cannot be tolled in a § 12(1) claim, *e.g.*, *Cook v. Avien, Inc.*, 573 F.2d 685, 691 (1st Cir.1978); *see also*

Loss at 1164, in the absence of controlling precedent, the Court concludes that no sound reason has been advanced why the tolling doctrine should not apply. Unlike § 13's three-year period, which is preceded by the words "in no event," the one-year period does not on its face pose an absolute bar to suit. Thus, the fraudulent concealment doctrine should be read into this statute as it is read into any other federal statute of limitations. *See Holmberg v. Armbrecht*, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); *see also Hudson I*, [1982–83 Transfer Binder] Fed.Sec.L. Rep. (CCH) at 95,908.[8]

Although the Court concludes that the statute is subject to tolling, plaintiffs clearly have failed adequately to plead fraudulent concealment. Proper allegations of fraudulent concealment must contain "facts showing affirmative conduct upon the part of the defendant which would, under the circumstances of the case, lead a reasonable person to believe that he did not have a claim for relief," and must also state "facts showing [plaintiff's] due diligence in trying to uncover the facts." *Rutledge v. Boston Woven Hose & Rubber Co.*, 576 F.2d 248, 250 (9th Cir.1978).

■ In the context of § 12(1) claims, plaintiffs who seek to allege fraudulent concealment have a particularly heavy pleading burden. They must plead with at least some particularity *why* they did not know the securities should have been registered, *when* they first discovered registration was required, *what* circumstances or events led to that discovery and *why* they did not discover those facts earlier. The instant complaints fall far short of this standard. They contain only conclusory allegations that defendants "affirmatively misrepresented" to plaintiffs that the Certificates were exempt from registration, "actively concealed" that the fractional interests in the mortgage pools did not quali-

fy for any exemption from registration and failed to disclose or provide access to the kind of information required to be in a registration statement.

■ Obviously, plaintiffs knew full well the securities were not registered; moreover, these allegations do not begin to explain how defendants were able to conceal material facts regarding securities registration requirements from sophisticated financial institutions such as First Federal and Missouri. Although the complaints do contain some factual allegations regarding fraudulent concealment, none of those allegations pertain to the fact the securities were not registered. Accordingly, plaintiffs' § 12(1) claims must be dismissed as time barred, although First Federal will be granted leave to amend, as will Missouri with respect to its § 12(1) claim based on its Series "D" Certificate. However, Missouri's § 12(1) claim based on the Series "A" Certificate falls outside § 13's absolute three-year time limit and thus must be dismissed with prejudice.

■ Missouri attempts to save its Series "A" Certificate claim by arguing that defendants' offer of numerous mortgage-backed Certificates to various prospective purchasers during the period 1981–1984 constitutes a single "integrated offering" of a security, and that the three-year time period should not begin to run until the *last* offering of the security. *Hudson I*, [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 95,896 n. 3 (relevant offering for purposes of § 13's three-year limit on § 12(1) actions is the last offering of the security). This argument is not persuasive. First, most authorities conclude, and the Court agrees, that the relevant offering under § 13 is the *first* offering of the security. *See Morley v. Cohen*, 610 F.Supp. at 816 & n. 18 (collecting cases); *see also* Loss at 1164 (§ 13's language "presumably

---

**8.** In reaching this conclusion, the Court does not rely on *Katz v. Amos Treat & Co.*, 411 F.2d 1046, 1055 (2d Cir.1969). As Lord Bissell points out, *Katz* held that equitable *estoppel* applies to § 13's one-year period. However, equitable estoppel and equitable tolling are two distinct concepts, although numerous cases since *Katz* have cited *Katz* for the proposition that § 13 is subject to equitable *tolling*. *E.g., Hudson I*, [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 95,908; *Houlihan v. Anderson-Stokes, Inc.*, 434 F.Supp. 1319, 1322 (D.D.C.1977).

... means *first* offered to the public") (emphasis in original). Moreover, the Court agrees with the reasoning in *Homburger v. Venture Minerals, Inc.*, [1982 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 98,858 at 94,426 n. 3 (S.D.N.Y.1982). There, the court convincingly rebutted an argument virtually identical to the one Missouri makes here:

> Here there are five plaintiffs, each (for all that appears from the complaint) making separate purchases at separate times. No reason in law or logic is suggested why a purchase by one plaintiff in, say, 1978 should operate to preserve as timely a claim brought by a different plaintiff for a different purchase in 1975.[9]

Riverhead's § 12(1) claim is timely, having purchased its Series "C" Certificate on April 30, 1984, and filed its complaint on March 22, 1985. Therefore, the Court must address Lord Bissell's argument that it is not a "seller" within the meaning of § 12.

### 2. *Who Are "Sellers"*

Defendants argue that in *Feldman v. Simpkins Indus., Inc.*, 679 F.2d 1299, 1305 (9th Cir.1982), the Ninth Circuit abandoned its "substantial participation" test for determining a "seller" under § 12, *see SEC v. Murphy*, 626 F.2d 633, 649–51 (9th Cir. 1980), in favor of a stricter "transactional privity" test.[10] This is a dubious reading of *Feldman*. No Ninth Circuit case has explicitly adopted transactional privity as the test under § 12. In fact, in a post-*Feldman* case, the Ninth Circuit upheld the verdict of a jury that had been instructed under the *Murphy* standards. *Underhill v. Royal*, 769 F.2d at 1434. Therefore, *Murphy* remains controlling authority in this Circuit.

Under the "substantial participation" test, defendant must have been both (1) "necessary to" the sale of the security, *i.e.*, he must have been a "but for" cause, and (2) a "substantial factor" in the sales transaction. *Murphy*, 626 F.2d at 649–51. Further, the defendant must actually have participated in the selling process. *Hudson I*, [1982–83 Transfer Binder] Fed. Sec.L.Rep. (CCH) at 95,904. Thus, allegations that defendants merely "participated in preparing the Registration Statement and prospectus and certain financing mechanisms" have been found insufficient. *In re Diasonics Sec. Litig.*, 599 F.Supp. 447, 458 (N.D.Cal.1984). As summarized in *Hokama*, 566 F.Supp. at 641:

> If the defendant is not in literal privity with the plaintiff, his conduct must proximately cause the sale, or he must be a "motivating force" behind the sale; mere participation in the events leading up to the sale is not sufficient.

The Court concludes that dismissal on the basis that Lord Bissell and Michael were not "sellers" would be premature. The complaints allege more than that Michael and Lord Bissell provided legal services to NMEC in the form of preparing documentation for the pools. Michael also is alleged to be an officer and part owner of NMEC who was involved in NMEC's operations from the very beginning. While the complaints do not set out the exact nature of defendants' relationship to the NMEC sales program, the allegations are sufficient in the circumstances here to withstand a motion to dismiss.

## E. SECTION 12(2) CLAIMS

### 1. *Statute of Limitations*

Claims brought under § 12(2) of the 1933 Act, 15 U.S.C. § 77*l* (2), also are governed by § 13's limitations period, *i.e.*, they must

---

**9.** The Court also agrees with *Homburger*'s conclusion that *SEC v. Murphy*, 626 F.2d 633, 645 (9th Cir.1980), is inapposite in these circumstances. *Murphy* lists the factors that determine whether seemingly separate offerings should be considered "integrated," but does so only for the purpose of determining whether an issuer is entitled to § 4(2)'s private offering exemption.

Thus, *Murphy* has no bearing on the statute of limitations issue.

**10.** The so-called "transactional privity" test imposes § 12 liability only on the purchaser's immediate seller. *See Collins v. Signetics Corp.*, 605 F.2d 110, 113 (3d Cir.1979).

be brought "within one year after the discovery of the untrue statement, or after such discovery should have been made by the exercise of reasonable diligence," and "in no event ... more than three years after the sale."

■ First Federal and Missouri allege they did not discover the fraud until January, 1985, when payments to Certificate holders ceased and B of A publicly disclosed the facts of the scheme. Plaintiffs' allegations of fraudulent concealment are sufficient. *See Hudson I,* [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) at 95,907. They allege that defendants covered up the high default rates in the earlier pools by using funds obtained from the sale of later Certificates to advance payments to the earlier Certificate holders. However, plaintiffs have not adequately pleaded due diligence. *See id.* at 95,908. They mention a letter from Advance to Wells Fargo written in December, 1982, in which Advance described the high default rates, questionable appraisals, and other suspect practices connected with the pools. Although plaintiffs allege they knew none of this information until January, 1985, they do not allege when they first learned of the Advance letter. Moreover, the complaints also state that Advance resigned as servicer in March 1983. While the complaints intimate that Wells Fargo pressured plaintiffs into approving the substitution of NMEC as servicer, plaintiffs do not allege what steps, if any, they took to investigate the circumstances surrounding Advance's resignation.[11] It may be that reasonable inquiry would have revealed facts putting plaintiffs on notice of the fraud. Since First Federal and Missouri have not met their burden of affirmatively pleading facts to show compliance with the statute of limitations, *Toombs v. Leone,* 777 F.2d at 468, their § 12(2) claims are dismissed, with leave to amend.

### 2. *Knowledge of Falsity*

■ Riverhead's § 12(2) claim is timely. However, Lord Bissell attacks this claim on other grounds. Section 12(2) expressly requires that the purchaser be unaware of the false statement or omission connected with the sale of the security. Lord Bissell contends that because Wells Fargo was on notice of the fraud in 1982 (through the Advance letter), Wells Fargo's knowledge should be imputed to Riverhead, since Wells Fargo was acting as Riverhead's fiduciary at the time of purchase in 1984. This argument must be rejected. First, the cases Lord Bissell cites deal with imputation of knowledge in a husband-wife relationship, *Parsons v. Hornblower & Weeks-Hemphill Noyes,* 447 F.Supp. 482 (M.D.N.C.1977), and an attorney-client relationship, *Dandorph v. Fahnestock & Co.,* 462 F.Supp. 961 (D.Conn.1979). Those relationships are vastly different from that existing between Riverhead and Wells Fargo. More importantly, it simply makes no sense to charge the victim of a fraudulent scheme with knowledge possessed by one of the alleged participants in the scheme. Under Lord Bissell's theory, a victim of a securities fraud could never bring a claim against his fiduciary, since the victim would always be charged with knowledge of the fraud.

### 3. *Aider and Abettor Liability*

■ Finally, the Court agrees with Lord Bissell that aiding and abetting liability cannot be imposed under § 12(2). *Hokama,* 566 F.Supp. at 642. Where a statute expressly limits the class of persons subject to liability—in this case "offerors or sellers"—courts should not extend liability, under aiding and abetting, to persons not included in that class. *See In re Equity Funding Corp. Sec. Litig.,* 416 F.Supp. 161, 181 (C.D.Cal.1976). Moreover, allow-

---

**11.** In their briefs, the Savings Banks state that Wells Fargo inquired into the allegations made in the Advance letter, but that Lord Bissell fraudulently concealed the true facts from Wells Fargo. Supposedly, Lord Bissell represented to Wells Fargo that Lord Bissell had made a thor-

ough investigation into Advance's charges, and determined that NMEC was innocent of any wrongdoing. Even if this contention were true, it does not explain what due diligence *the Savings Banks* undertook to uncover their claim.

ing aiding and abetting would "eviscerate" *Murphy*'s "substantial participation" test. *In re Diasonics,* 599 F.Supp. at 458.

### F. STATE SECURITIES LAW CLAIMS

The applicable statute of limitations for the Savings Banks' state securities law claims is Cal.Corp.Code § 25506. That statute requires plaintiffs to bring their actions within four years after the act upon which the violation is based or within one year after discovery of the facts constituting the violation, whichever occurs first. The one-year period begins to run when the plaintiff "discovers the facts constituting the violation or in the exercise of reasonable diligence should have discovered them." *Kramas v. Security Gas & Oil, Inc.,* 672 F.2d 766, 770 (9th Cir.), *cert. denied,* 459 U.S. 1035, 103 S.Ct. 444, 74 L.Ed.2d 600 (1982). This is the same standard applied to § 12(2) claims. Accordingly, First Federal's and Missouri's state claims are dismissed as time barred, with leave to amend.[12]

 Riverhead's timely claim alleges all defendants except Lord Bissell violated Cal.Corp.Code § 25501, which states: "Any person who violates Section 25401 shall be liable to the person who purchases a security from him or sells a security to him." Liability is limited to actual sellers. *SEC v. Seaboard Corp. (Admiralty Fund v. Jones),* 677 F.2d 1289, 1296 (9th Cir.1982). Because there are no allegations that Michael was an actual seller of the Series "C" Certificate, Michael cannot be liable under § 25501. Michael also cannot be subject to control person liability under § 25504. "Section 25504, by its terms, applies to violations of section 25501. Hence, strict privity is still required." *In re Diasonics,* 599 F.Supp. at 459.

However, Michael may be subject to liability under § 25504.1, which imposes joint and several liability on persons who "materially assist" in violations of § 25401. Section 25504.1 in effect establishes aiding and

abetting liability. *Hudson I,* [1982–83 Transfer Binder] Fed.Sec.L.Rep. (CCH) 95,-906. As the Court has explained, plaintiffs' aiding and abetting allegations are sufficient.

### G. RICO CLAIMS

All plaintiffs bring claims under the Racketeering Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 *et seq.* Each complaint alleges securities fraud and mail and wire fraud as the predicate acts constituting the requisite "pattern of racketeering activity." *See* 18 U.S.C. § 1961. For the reasons discussed in Memo.Op. I, Part III.C.2, the predicate act allegations of each of the Savings Banks are adequate.

First Federal and Riverhead charge NMEC, Feldman and Michael with violations of 18 U.S.C. §§ 1962(c) (conducting the affairs of a RICO "enterprise" through a "pattern of racketeering activity"), and 1962(d) (conspiring to violate § 1962(c)). For the reasons stated in Memo.Op. I, Part III.C.4, the RICO "enterprise" allegations are deficient. As in B of A's complaint, the "enterprise" is alleged to be nothing more than an association in fact formed for the purpose of committing the predicte acts of fraud. Similarly, the RICO conspiracy allegations are insufficient. *See* Memo.Op. I, Part III.C.5. Accordingly, these RICO claims are dismissed with leave to amend.

Missouri's RICO claim is substantially different from the others, because it names NMEC itself as the RICO enterprise. It then charges Michael with violations of § 1962(a) (using income received from a pattern of racketeering activity to acquire an interest in or operate an enterprise) and § 1962(b) (acquiring or maintaining an interest in an enterprise through a pattern of racketeering activity), and both Michael and Lord Bissell with violations of §§ 1962(c) and (d).

---

12. Because, as stated, the California statute contains a four-year maximum period, rather than the three-year period of § 13, Missouri's state securities law claim based on its Series "A" Certificate is not absolutely barred.

Missouri has stated a claim for relief under each of its RICO theories, except for a § 1962(d) conspiracy. Michael objects to the § 1962(a) theory solely on the ground that the allegations are conclusory and are based on information and belief. As previously discussed, the Court is not persuaded by this line of argument. In attacking the § 1962(b) theory, Michael raises the additional argument that he allegedly acquired his interest in NMEC in 1980, *before* he engaged in the alleged pattern of racketeering. However, the plain language of the statute makes it illegal to "acquire *or maintain*" an interest in an enterprise through a pattern of racketeering. 18 U.S.C. § 1962(b) (emphasis added).

Defendants next argue that Missouri's § 1962(c) claim fails because it alleges only that defendants used money from the sale of Certificates to operate NMEC's business, but does not properly allege that defendants actually "conducted" NMEC's affairs. They also argue that a § 1962(c) claim "ordinarily will require some participation in the *operation or management* of the enterprise itself." *Bennett v. Berg*, 710 F.2d 1361, 1364 (8th Cir.), *cert. denied*, 464 U.S. 1008, 104 S.Ct. 527, 78 L.Ed.2d 710 (1983) (emphasis added).

The Court rejects both contentions. The first argument focuses on an isolated sentence in the RICO count and ignores the rest of the complaint which adequately alleges defendants' participation in the conduct of NMEC's affairs. As for the degree of participation § 1962(c) requires, the Court adopts the reasoning of *Bank of America NT & SA v. Touche Ross & Co.*, 782 F.2d 966, 970 (11th Cir.1986):

> RICO does not require the degree of participation urged by defendants. It is not necessary that a RICO defendant participate in the management or operation of the enterprise. On its face, the statute requires only that the defendant "participate, directly or indirectly in the conduct of [the] enterprise's affairs ..."
>
> \* \* \* \* \* \*
>
> The complaint alleges sufficient participation to withstand a 12(b)(6) motion.

The banks have alleged that defendants assisted in the preparation and dissemination of false financial statements. These financial statements were helpful to International Horizons because they allegedly induced the banks to lend money to the enterprise. The word "conduct" in § 1962(c) simply means the performance of activities necessary or helpful to the operation of the enterprise. [Citations omitted.]

This construction of the statute comports with the Court's approach in *Sedima, S.P. R.L. v. Imrex Co., Inc.*, ── U.S. ──, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985).

Finally, with respect to the § 1962(d) theory, the parties do not differentiate between it and § 1962(c), agreeing that it rises and falls with the § 1962(c) claim. However, this fails to address the "injury" requirement imposed on a private litigant under § 1964(c). Like the other Savings Banks, Missouri also fails to plead this requirement; therefore, its RICO conspiracy claim must be dismissed. *See* Memo.Op. I, Part III.C.5. Because Missouri pleads a single RICO claim embracing all theories, including conspiracy, although the claim is otherwise sufficient, the entire RICO claim will be dismissed with leave to amend.

## H. UMPQUA'S MOTION

Riverhead has made a number of fraud-based claims against Umpqua, *i.e.*, under § 12(2), Rule 10b–5, state securities law and common law fraud. However, the complaint contains only two paragraphs that purport to describe Umpqua's role in the fraud, and those paragraphs simply lump together Umpqua with other defendants in alleging that Umpqua failed to disclose certain material facts, including the facts contained in Advance's December, 1982 letter to Wells Fargo. However, the complaint does not allege that Umpqua had any knowledge of the allegedly omitted facts or had any reason to know them.

The irony of Riverhead's position is evident. On the one hand, Riverhead portrays

itself as an unwitting victim of the fraud, with no knowledge of the true facts nor any reason to know those facts. On the other hand, Riverhead alleges that Umpqua, which was in precisely the same position as Riverhead, *i.e.*, a Certificate holder, knew or was reckless in not knowing critical facts relating to the fraud. The only factual allegation that comes close to explaining Riverhead's theory is that the president of MEBAC (which acted as Umpqua's broker), was also president of NMEC at the time of the Umpqua-Riverhead sale. Even under the liberal pleading standards of the Federal Rules, this is not enough to support the serious charges Riverhead levels at Umpqua.[13]

Therefore, all of Riverhead's fraud-based claims are dismissed for failure to comply with F.R.Civ.P. 9(b). *See Walling v. Beverly Enterprises,* 476 F.2d at 397. However, Riverhead is granted leave to amend to explain why Umpqua should be chargeable with knowledge of facts that Riverhead claims it did not know about, but with the admonition that any such allegations ultimately will be subject to review under Rule 11.

■ Riverhead has stated a claim under § 12(1) however, because that provision is not grounded in fraud. Umpqua first contends that it is not a "seller" under § 12. This argument borders on the frivolous. The complaint clearly alleges that Umpqua, through a broker, MEBAC, sold its interest in the Series "C" pool to Riverhead. The sale was consummated pursuant to an amendment to the PSA, which was executed by Wells Fargo, NMEC, Riverhead and *Umpqua.* Clearly, Umpqua was at least a "substantial participant" in the sales transaction. Umpqua's argument that it is not a "seller" because the Certificate Riverhead purchased was "different" than the one Umpqua purchased is equally meritless. Riverhead, of course, received a different piece of paper called a "Certifi-

cate", but the paper represented the *same interest, i.e.,* an undivided interest in the Series "C" pool. That Riverhead's Certificate may have contained slightly different terms [14] does not affect Umpqua's "seller" status for the purposes of this motion.

■ Umpqua also contends that it should be exempted under § 4(1) of the 1933 Act, 15 U.S.C. § 77d(1), which provides an exemption from § 5's registration requirement for "transactions by any person other than an issuer, underwriter or dealer." The burden of proof is on the party claiming the exemption. *Pennaluna & Co., Inc. v. SEC,* 410 F.2d 861, 865 (9th Cir.1969), *cert. denied,* 396 U.S. 1007, 90 S.Ct. 562, 24 L.Ed.2d 499 (1970). Umpqua's contention that it is not an "issuer, underwriter or dealer" misses the point of § 4(1). As explained in *SEC v. Murphy,* 626 F.2d at 648:

> Section 4(1) was designed to exempt routine trading transactions with respect to securities already issued and not to exempt distributions by issuers or acts of others who engage in steps necessary to such distributions ... *The section exempts transactions, not persons, ...* and it is inapplicable in cases involving a distribution of new securities by an issuer. [Citations omitted; emphasis added.]

Thus, as *Murphy* noted, the Second Circuit long ago rejected Umpqua's argument:

> Even if the defendant is not itself "an issuer, underwriter or dealer" it was participating in a transaction with an issuer, to wit, the Chinese government. The argument in behalf of the defendant incorrectly assumes that Section 4(1) applies to the component parts of the entire transaction we have mentioned and thus exempts defendant unless it is an underwriter for the Chinese Republic.

**13.** This pleading also raises serious questions with respect to the requisite scienter for each of the fraud-based claims.

**14.** Umpqua also contends that Riverhead's Series "C" Certificate was secured by a "different mix" of notes and collateral. This contention, however, is not supported by the record and will not be considered on the motion to dismiss.

*SEC v. Chinese Consolidated Benevolent Ass'n,* 120 F.2d 738, 741 (2d Cir.), *cert. denied,* 314 U.S. 618, 62 S.Ct. 106, 86 L.Ed. 497 (1941).

Thus, for Umpqua to claim the § 4(1) exemption, it must show that the *transaction* is exempt. Here, there is no showing that the sale in question was a "routine trading transaction with respect to securities already issued," or any other showing sufficient to bring the transaction within § 4(1)'s ambit.

## I. DISMISSAL OF COUNTERCLAIMS

 Lomas & Nettleton ("L & N"), the successor in interest to Advance, has counterclaimed against First Federal and Missouri. L & N alleges that pursuant to the terms of the PSAs for the Series "A", "B" and "D" pools, the Trust Funds and Certificate Accounts administered by Wells Fargo are required to indemnify L & N for any losses, legal expenses and costs L & N incurs in this action, should L & N be found free of wilfull misfeasance, bad faith or negligence. L & N claims that if the funds held in trust by Wells Fargo are insufficient fully to reimburse L & N, an "equitable trust" should be impressed on Missouri and First Federal "to the extent [they have] received any funds from Wells Fargo Bank as trustee."

L & N essentially is urging the Court to impose a constructive trust on the funds in question.[15] "A constructive trust is an equitable remedy imposed where the defendant holds title or some interest in certain property which it is inequitable for him to enjoy as against the plaintiff." *Kraus v. Willow Park Public Golf Course,* 73 Cal. App.3d 354, 373, 140 Cal.Rptr. 744 (1977). Thus, in order to create a constructive trust, the plaintiff must show that the defendant was unjustly enriched, *i.e.,* that it

gained the property in question "by fraud, accident, mistake, undue influence, the violation of a trust or other wrongful act." *Id.* See also, 7 Witkin, Summary of California Law, *Trusts,* § 131, pp. 5487–88 (8th ed. 1974); *Restatement of Restitution,* § 160, comments *a-d* (1962). The bare allegations of L & N's counterclaim make not the slightest suggestion that the Savings Banks were unjustly enriched. Nor does it appear to the Court that any such allegations can be made under the circumstances here. Accordingly, the counterclaims must be dismissed with prejudice.

## III. ORDER

IT IS ORDERED:

1. The First, Second, Fourth and Fifth Claims of the complaints of all three Savings Banks and the Third and Sixth Claims of the complaint of Riverhead, as against defendant Umpqua, are dismissed with 30 days' leave to file and serve amended complaints, except that dismissal of the First Claim of the complaint of Missouri with respect to the Series "A" Certificate is without leave to amend.

2. In all other respects the motions to dismiss the complaints or any claims of the Savings Banks are denied.

3. The counterclaims of Lomas & Nettleton against First Federal and Missouri are dismissed without leave to amend.

---

**15.** L & N argues that use of the term "constructive trust" to describe its claim is inappropriate because it somehow misconstrues L & N's theory of recovery. However, L & N itself describes its claim as one sounding "in equity on a theory of unjust enrichment." That is precisely the theory embodied in the concept of constructive trust. "The concept of constructive trust is ... one of equitable remedy ... to prevent unjust enrichment and enforce restitution." *Haskel Engr'g & Supply Co. v. Hartford Accident & Indem. Co.,* 78 Cal.App.3d 371, 375, 144 Cal. Rptr. 189 (1978). In any event, regardless of the label attached to L & N's claim, L & N has failed to show how the Savings Banks were unjustly enriched.